OTTER  TAIL  POWER  CO.  *v.*  UNITED  STATES

No. 71–991.   Argued December 5, 1972—Decided February 22, 1973

DOUGLAS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, and MARSHALL, JJ., joined. STEWART, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 382. BLACKMUN and POWELL, JJ., took no part in the consideration or decision of the case.

*Milton Handler* argued the cause for appellant. With him on the briefs were *Cyrus A. Field, David F. Lundeen,* and *Michael D. Blechman.*

*Lawrence G. Wallace* argued the cause for the United States. On the brief were *Solicitor General Griswold, Assistant Attorney General Kauper, Samuel Huntington, Howard E. Shapiro,* and *Kenneth C. Anderson.**

*Briefs of *amici curiae* urging reversal were filed by *Leo E. Forquer* and *George W. McHenry, Jr.,* for the Federal Power Commission; by *George D. Gibson, John H. Shenefield, Frederick T. Searls, William B. Kuder, Malcolm H. Furbush,* and *C. Hayden Ames* for General Public Utilities Corp. et al.; and by *H. Thomas Austern* and *E. Edward Bruce* for Seventeen Investor-Owned Electrical Utilities.

Briefs of *amici curiae* urging affirmance were filed by *John P. McKenna, John C. Scott,* and *Osee R. Fagan* for the City of Gainesville, Florida; by *Herbert L. Meschke* and *Jan M. Sebby* for the Village of Elbow Lake, Minnesota; by *C. Emerson Duncan II* and *Donald R. Allen* for Missouri Basin Municipal Power Agency; and by *Northcutt Ely* for American Public Power Association.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In this civil antitrust suit brought by appellee against Otter Tail Power Co. (Otter Tail), an electric utility company, the District Court found that Otter Tail had attempted to monopolize and had monopolized the retail distribution of electric power in its service area in violation of § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 2. The District Court found that Otter Tail had attempted to prevent communities in which its retail distribution franchise had expired from replacing it with a municipal distribution system. The principal means employed were (1) refusals to sell power at wholesale to proposed municipal systems in the communities where it had been retailing power; (2) refusals to "wheel" power to such systems, that is to say, to transfer by direct transmission or displacement electric power from one utility to another over the facilities of an intermediate utility; (3) the institution and support of litigation designed to prevent or delay establishment of those systems; and (4) the invocation of provisions in its transmission contracts with several other power suppliers for the purpose of denying the municipal systems access to other suppliers by means of Otter Tail's transmission systems.

Otter Tail sells electric power at retail in 465 towns in Minnesota, North Dakota, and South Dakota. The District Court's decree enjoins it from refusing to sell electric power at wholesale to existing or proposed municipal electric power systems in the areas serviced by Otter Tail, from refusing to wheel electric power over the lines from the electric power suppliers to existing or proposed municipal systems in the area, from entering into or enforcing any contract which prohibits use of Otter Tail's lines

to wheel electric power to municipal electric power systems, or from entering into or enforcing any contract which limits the customers to whom and areas in which Otter Tail or any other electric power company may sell electric power.

The decree also enjoins Otter Tail from instituting, supporting, or engaging in litigation, directly or indirectly, against municipalities and their officials who have voted to establish municipal electric power systems for the purpose of delaying, preventing, or interfering with the establishment of a municipal electric power system. 331 F. Supp. 54. Otter Tail took a direct appeal to this Court under § 2 of the Expediting Act, as amended, 62 Stat. 989, 15 U. S. C. § 29; and we noted probable jurisdiction, 406 U. S. 944.

In towns where Otter Tail distributes at retail, it operates under municipally granted franchises which are limited from 10 to 20 years. Each town in Otter Tail's service area generally can accommodate only one distribution system, making each town a natural monopoly market for the distribution and sale of electric power at retail. The aggregate of towns in Otter Tail's service area is the geographic market in which Otter Tail competes for the right to serve the towns at retail.[1] That competition is generally for the right to serve the entire

---

[1] Northern States Power Co. also supplies some towns in Otter Tail's area with electric power at retail. But the District Court excluded these towns from Otter Tail's area because the two companies do not compete in the towns served by each other. Of the 615 remaining towns in the area, 465 are served at retail by Otter Tail, 45 by municipal systems, and 105 by rural electric cooperatives. The cooperatives are barred by § 4 of the Rural Electrification Act of 1936, 49 Stat. 1365, as amended, 7 U. S. C. § 904, from borrowing federal funds to provide power to towns already receiving central station service. For this and related reasons, the District Court excluded the rural cooperatives from the relevant market.

retail market within the composite limits of a town, and that competition is generally between Otter Tail and a prospective or existing municipal system. These towns number 510 and of those Otter Tail serves 91%, or 465.

Otter Tail's policy is to acquire, when it can, existing municipal systems within its service areas. It has acquired six since 1947. Between 1945 and 1970, there were contests in 12 towns served by Otter Tail over proposals to replace it with municipal systems. In only three—Elbow Lake, Minnesota, Colman, South Dakota, and Aurora, South Dakota—were municipal systems actually established. Proposed municipal systems have great obstacles; they must purchase the electric power at wholesale. To do so they must have access to existing transmission lines. The only ones available [2] belong to Otter Tail. While the Bureau of Reclamation has high-voltage bulk-power supply lines in the area, it does not operate a subtransmission network, but relies on wheeling contracts with Otter Tail and other utilities to deliver power for its bulk supply lines to its wholesale customers.[3]

The antitrust charge against Otter Tail does not involve the lawfulness of its retail outlets, but only its methods of preventing the towns it served from establishing their own municipal systems when Otter Tail's

---

[2] Subtransmission lines, with voltages from 34.5 kv to 69 kv are used for moving power from the bulk supply lines to points of local distribution. Of Otter Tail's basic subtransmission system in this area, two-thirds of those lines are 41.6 kv subtransmission lines.

[3] The 38 distribution rural cooperatives in Otter Tail's area generally own only low-voltage distribution lines, which in most instances could not be used to supply power to proposed municipal utilities. The few rural cooperatives that have generation and transmission services do not, it was found, cut significantly into Otter Tail's dominant position in subtransmission.

franchises expired. The critical events centered largely in four towns—Elbow Lake, Minnesota, Hankinson, North Dakota, Colman, South Dakota, and Aurora, South Dakota. When Otter Tail's franchise in each of these towns terminated, the citizens voted to establish a municipal distribution system. Otter Tail refused to sell the new systems energy at wholesale and refused to agree to wheel power from other suppliers of wholesale energy.

Colman and Aurora had access to other transmission. Against them, Otter Tail used the weapon of litigation.

As respects Elbow Lake and Hankinson, Otter Tail simply refused to deal, although according to the findings it had the ability to do so. Elbow Lake, cut off from all sources of wholesale power, constructed its own generating plant. Both Elbow Lake and Hankinson requested the Bureau of Reclamation and various cooperatives to furnish them with wholesale power; they were willing to supply it if Otter Tail would wheel it. But Otter Tail refused, relying on provisions in its contracts which barred the use of its lines for wheeling power to towns which it had served at retail. Elbow Lake after completing its plant asked the Federal Power Commission, under § 202 (b) of the Federal Power Act, 49 Stat. 848, 16 U. S. C. § 824a (b), to require Otter Tail to interconnect with the town and sell it power at wholesale. The Federal Power Commission ordered first a temporary [4] and then a permanent connection.[5] Hankinson tried unsuccessfully to get relief from the North Dakota Commission and then filed a complaint with the federal com-

---

[4] *Elbow Lake* v. *Otter Tail Power Co.,* 40 F. P. C. 1262, aff'd, *Otter Tail Power Co.* v. *FPC,* 429 F. 2d 232 (CA8), cert. denied, 401 U. S. 947.

[5] *Elbow Lake* v. *Otter Tail Power Co.,* 46 F. P. C. 675.

mission seeking an order to compel Otter Tail to wheel. While the application was pending, the town council voted to withdraw it and subsequently renewed Otter Tail's franchise.

It was found that Otter Tail instituted or sponsored litigation involving four towns in its service area which had the effect of halting or delaying efforts to establish municipal systems. Municipal power systems are financed by the sale of electric revenue bonds. Before such bonds can be sold, the town's attorney must submit an opinion which includes a statement that there is no pending or threatened litigation which might impair the value or legality of the bonds. The record amply bears out the District Court's holding that Otter Tail's use of litigation halted or appreciably slowed the efforts for municipal ownership. "The delay thus occasioned and the large financial burden imposed on the towns' limited treasury dampened local enthusiasm for public ownership." 331 F. Supp. 54, 62.

I

Otter Tail contends that by reason of the Federal Power Act it is not subject to antitrust regulation with respect to its refusal to deal. We disagree with that position.

"Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350–351. See also *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 357–361. Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws.

In *California* v. *FPC*, 369 U. S. 482, 489, the Court held that approval of an acquisition of the assets of a natural gas company by the Federal Power Commission pursuant to § 7 of the Natural Gas Act "would be no bar to [an] antitrust suit." Under § 7, the standard for approving such acquisitions is "public convenience and necessity." Although the impact on competition is relevant to the Commission's determination, the Court noted that there was "no 'pervasive regulatory scheme' including the antitrust laws that ha[d] been entrusted to the Commission." *Id.,* at 485. Similarly, in *United States* v. *Radio Corp. of America,* 358 U. S. 334, the Court held that an exchange of radio stations that had been approved by the Federal Communications Commission as in the "public interest" was subject to attack in an antitrust proceeding.

The District Court determined that Otter Tail's consistent refusals to wholesale or wheel power to its municipal customers constituted illegal monopolization. Otter Tail maintains here that its refusals to deal should be immune from antitrust prosecution because the Federal Power Commission has the authority to compel involuntary interconnections of power pursuant to § 202 (b) of the Federal Power Act. The essential thrust of § 202, however, is to encourage voluntary interconnections of power. See S. Rep. No. 621, 74th Cong., 1st Sess., 19–20, 48–49; H. R. Rep. No. 1318, 74th Cong., 1st Sess., 8. Only if a power company refuses to interconnect voluntarily may the Federal Power Commission, subject to limitations unrelated to antitrust considerations, order the interconnection. The standard which governs its decision is whether such action is "necessary or appropriate in the public interest." Although antitrust considerations may be relevant, they are not determinative.

There is nothing in the legislative history which re-

veals a purpose to insulate electric power companies from the operation of the antitrust laws. To the contrary, the history of Part II of the Federal Power Act indicates an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest. As originally conceived, Part II would have included a "common carrier" provision making it "the duty of every public utility to . . . transmit energy for any person upon reasonable request . . . ." In addition, it would have empowered the Federal Power Commission to order wheeling if it found such action to be "necessary or desirable in the public interest." H. R. 5423, 74th Cong., 1st Sess.; S. 1725, 74th Cong., 1st Sess. These provisions were eliminated to preserve "the voluntary action of the utilities." S. Rep. No. 621, 74th Cong., 1st Sess., 19.

It is clear, then, that Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. When these relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws. See *United States* v. *Radio Corp. of America, supra,* at 351. This is particularly true in this instance because Congress, in passing the Public Utility Holding Company Act, which included Part II of the Federal Power Act, was concerned with "restraint of free and independent competition" among public utility holding companies. See 15 U. S. C. § 79a (b)(2).

Thus, there is no basis for concluding that the limited authority of the Federal Power Commission to order interconnections was intended to be a substitute for, or

to immunize Otter Tail from, antitrust regulation for refusing to deal with municipal corporations.

## II

The decree of the District Court enjoins Otter Tail from "[r]efusing to sell electric power at wholesale to existing or proposed municipal electric power systems in cities and towns located in [its service area]" and from refusing to wheel electric power over its transmission lines from other electric power lines to such cities and towns. But the decree goes on to provide:

> "The defendant shall not be compelled by the Judgment in this case to furnish wholesale electric service or wheeling service to a municipality except at rates which are compensatory and under terms and conditions which are filed with and subject to approval by the Federal Power Commission."

So far as wheeling is concerned, there is no authority granted the Commission under Part II of the Federal Power Act to order it, for the bills originally introduced contained common carrier provisions which were deleted.[6] The Act as passed contained only the interconnection provision set forth in § 202 (b).[7] The common carrier

---

[6] See S. Rep. No. 621, 74th Cong., 1st Sess.; H. R. Rep. No. 1318, 74th Cong., 1st Sess.; *Elbow Lake* v. *Otter Tail Power Co.,* 46 F. P. C., at 679.

[7] Section 202 (b) provides: "Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the

provision in the original bill and the power to direct wheeling were left to the "voluntary coordination of electric facilities." [8]   Insofar as the District Court ordered wheeling to correct anticompetitive and monopolistic practices of Otter Tail, there is no conflict with the authority of the Federal Power Commission.

As respects the ordering of interconnections, there is no conflict on the present record.   Elbow Lake applied to the Federal Power Commission for an interconnection with Otter Tail and, as we have said, obtained it.   Hankinson renewed Otter Tail's franchise.   So the decree of the District Court, as far as the present record is concerned, presents no actual conflict between the federal judicial decree and an order of the Federal Power Commission.   The argument concerning the pre-emption of the area by the Federal Power Commission concerns only instances which may arise in the future, if Otter Tail continues its hostile attitude and conduct against "existing or proposed municipal electric power systems." The decree of the District Court has an open end by which that court retains jurisdiction "necessary or appropriate" to carry out the decree or "for the modification of any of the provisions."   It also contemplates that future disputes over interconnections and the terms

transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.   The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them."

[8] S. Rep. No. 621, *supra,* n. 6, at 19.

and conditions governing those interconnections will be subject to Federal Power Commission perusal. It will be time enough to consider whether the antitrust remedy may override the power of the Commission under § 202 (b) as, if, and when the Commission denies the interconnection and the District Court nevertheless undertakes to direct it. At present, there is only a potential conflict, not a present concrete case or controversy concerning it.

## III

The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation of the antitrust laws. See *United States* v. *Griffith,* 334 U. S. 100, 107. The District Court determined that Otter Tail has "a strategic dominance in the transmission of power in most of its service area" and that it used this dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply. 331 F. Supp., at 60. Use of monopoly power "to destroy threatened competition" is a violation of the "attempt to monopolize" clause of § 2 of the Sherman Act. *Lorain Journal* v. *United States,* 342 U. S. 143, 154; *Eastman Kodak Co.* v. *Southern Photo Materials Co.,* 273 U. S. 359, 375. So are agreements not to compete, with the aim of preserving or extending a monopoly. *Schine Chain Theatres* v. *United States,* 334 U. S. 110, 119. In *Associated Press* v. *United States,* 326 U. S. 1, a cooperative news association had bylaws that permitted member newspapers to bar competitors from joining the association. We held that that practice violated the Sherman Act, even though the transgressor "had not yet achieved a complete monopoly." *Id.,* at 13.

When a community serviced by Otter Tail decides not to renew Otter Tail's retail franchise when it expires, it may generate, transmit, and distribute its own electric power. We recently described the difficulties and problems of those isolated electric power systems. See *Gainesville Utilities* v. *Florida Power Corp.*, 402 U. S. 515, 517–520. Interconnection with other utilities is frequently the only solution. *Id.*, at 519 n. 3. That is what Elbow Lake in the present case did. There were no engineering factors that prevented Otter Tail from selling power at wholesale to those towns that wanted municipal plants or wheeling the power. The District Court found—and its findings are supported—that Otter Tail's refusals to sell at wholesale or to wheel were solely to prevent municipal power systems from eroding its monopolistic position.

Otter Tail relies on its wheeling contracts with the Bureau of Reclamation and with cooperatives which it says relieve it of any duty to wheel power to municipalities served at retail by Otter Tail at the time the contracts were made. The District Court held that these restrictive provisions were "in reality, territorial allocation schemes," 331 F. Supp., at 63, and were *per se* violations of the Sherman Act, citing *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1. Like covenants were there held to "deny defendant's competitors access to the fenced-off market on the same terms as the defendant." *Id.*, at 12. We recently re-emphasized the vice under the Sherman Act of territorial restrictions among potential competitors. *United States* v. *Topco Associates,* 405 U. S. 596, 608. The fact that some of the restrictive provisions were contained in a contract with the Bureau of Reclamation is not material to our problem for, as the Solicitor General says, "government con-

tracting officers do not have the power to grant immunity from the Sherman Act." Such contracts stand on their own footing and are valid or not, depending on the statutory framework within which the federal agency operates. The Solicitor General tells us that these restrictive provisions operate as a "hindrance" to the Bureau and were "agreed to by the Bureau only at Otter Tail's insistence," as the District Court found. The evidence supports that finding.

## IV

The District Court found that the litigation sponsored by Otter Tail had the purpose of delaying and preventing the establishment of municipal electric systems "with the expectation that this would preserve its predominant position in the sale and transmission of electric power in the area." [9] 331 F. Supp., at 62. The District Court in discussing *Eastern Railroad Conference* v. *Noerr Motor Freight,* 365 U. S. 127, explained that it was applicable "only to efforts aimed at influencing the legislative and executive branches of the government." *Ibid.*

---

[9] After noting that the "pendency of litigation has the effect of preventing the marketing of the necessary bonds thus preventing the establishment of a municipal system," 331 F. Supp., at 62, the District Court went on to find:

"Most of the litigation sponsored by the defendant was carried to the highest available appellate court and although all of it was unsuccessful on the merits, the institution and maintenance of it had the effect of halting, or appreciably slowing, efforts for municipal ownership. The delay thus occasioned and the large financial burden imposed on the towns' limited treasury dampened local enthusiasm for public ownership. In some instances, Otter Tail made offers to the towns to absorb the towns' costs and expenses, and enhance the quality of its service in exchange for a new franchise. Hankinson, after several years of abortive effort, accepted this type of offer and renewed defendant's franchise." *Ibid.*

That was written before we decided *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, 513, where we held that the principle of *Noerr* may also apply to the use of administrative or judicial processes where the purpose to suppress competition is evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims and thus is within the "mere sham" exception announced in *Noerr.* 365 U. S., at 144. On that phase of the order, we vacate and remand for consideration in light of our intervening decision in *California Motor Transport Co.*

## V

Otter Tail argues that, without the weapons which it used, more and more municipalities will turn to public power and Otter Tail will go downhill. The argument is a familiar one. It was made in *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365, a civil suit under § 1 of the Sherman Act dealing with a restrictive distribution program and practices of a bicycle manufacturer. We said: "The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct." *Id.,* at 375.

The same may properly be said of § 2 cases under the Sherman Act. That Act assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency. Otter Tail's theory collided with the Sherman Act as it sought to substitute for competition anticompetitive uses of its dominant economic power.[10]

---

[10] The Federal Power Commission said in *Elbow Lake* v. *Otter Tail Power Co.,* 46 F. P. C., at 678:

"The public interest is far broader than the economic interest of a particular power supplier. It is our legal responsibility, as the Supreme Court made clear in *Pennsylvania Water & Power Co.* v.

The fact that three municipalities which Otter Tail opposed finally got their municipal systems does not excuse Otter Tail's conduct. That fact does not condone the antitrust tactics which Otter Tail sought to impose. Moreover, the District Court repeated what we said in *FTC* v. *National Lead Co.*, 352 U. S. 419, 431, "those caught violating the Act must expect some fencing in." The proclivity for predatory practices has always been a consideration for the District Court in fashioning its antitrust decree. See *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, 190.

We do not suggest, however, that the District Court, concluding that Otter Tail violated the antitrust laws, should be impervious to Otter Tail's assertion that compulsory interconnection or wheeling will erode its integrated system and threaten its capacity to serve adequately the public. As the dissent properly notes, the Commission may not order interconnection if to do so "would impair [the utility's] ability to render adequate service to its customers." 16 U. S. C. § 824a (b). The District Court in this case found that the "pessimistic view" advanced in Otter Tail's "erosion study" "is not supported by the record." Furthermore, it concluded that "it does not appear that Bureau of Reclamation power is a serious threat to the defendant nor that it will be in the foreseeable future." Since the District

*FPC*, 343 U. S. 414 (1952), to use our statutory authority to assure 'an abundant supply of electric energy throughout the United States,' and particularly to use our statutory power under Section 202 (b) to compel interconnection and coordination when the public interest requires it. The exercise of that authority may well require, as it does here, that we order a public utility to interconnect with an isolated municipal system. The private company's lack of enthusiasm for the arrangement cannot deter us, so long as the public interest requires it."

Court has made future connections subject to Commission approval and in any event has retained jurisdiction to enable the parties to apply for "necessary or appropriate" relief and presumably will give effect to the policies embodied in the Federal Power Act, we cannot say under these circumstances that it has abused its discretion.

Except for the provision of the order discussed in part IV of this opinion, the judgment is

*Affirmed.*

MR. JUSTICE BLACKMUN and MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

I join Part IV of the Court's opinion, which sets aside the judgment and remands the case to the District Court for consideration of the appellant's litigation activities in light of our decision in *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508. As to the rest of the Court's opinion, however, I respectfully dissent.

The Court in this case has followed the District Court into a misapplication of the Sherman Act to a highly regulated, natural-monopoly industry wholly different from those that have given rise to ordinary antitrust principles. In my view, Otter Tail's refusal to wholesale power through interconnection or to perform wheeling services was conduct entailing no antitrust violation.

It is undisputed that Otter Tail refused either to wheel power or to sell it at wholesale to the towns of Elbow Lake, Minnesota, and Hankinson, North Dakota, both of which had formerly been its customers and had elected to establish municipally owned electric utility systems. The District Court concluded that Otter Tail had substantial monopoly power at retail and "strategic domi-

nance" in the subtransmission of power in most of its market area.[1] 331 F. Supp. 54, 58–60. The District Court then mechanically applied the familiar Sherman Act formula: since Otter Tail possessed monopoly power and had acted to preserve that power, it was guilty of an antitrust violation. Nowhere did the District Court come to grips with the significance of the Federal Power Act, either in terms of the specific regulatory apparatus it established or the policy considerations that moved the Congress to enact it. Yet it seems to me that these concerns are central to the disposition of this case.

In considering the bill that became the Federal Power Act of 1935, the Congress had before it the report of the National Power Policy Committee on Public-Utility Holding Companies. That report chiefly concerned patterns of ownership in the power industry and the evils of concentrated ownership by holding companies. The problem that Congress addressed in fashioning a regulatory system reflected a purpose to prevent unnecessary financial concentration while recognizing the "natural monopoly" aspects, and concomitant efficiencies, of power generation and transmission. The report stated that

"[w]hile the distribution of gas or electricity in any given community is tolerated as a 'natural monopoly' to avoid local duplication of plants, there is no

---

[1] The District Court looked to Otter Tail's service area, and measured market dominance in terms of the number of towns within that area served by Otter Tail. Computed this way, Otter Tail provides 91% of the retail market. 331 F. Supp. 54, 59. As the appellant points out, however, these towns vary in size from more than 29,000 to 20 inhabitants. If Otter Tail's size were measured by actual retail sales, its market share would be only 28.9% of the electricity sold at retail within its geographic market area. It is important to note that another reasonable geographical market unit might be each individual municipality. Viewed this way, whichever power company sells electricity at retail in a town has a complete monopoly.

justification for an extension of that idea of local monopoly to embrace the common control, by a few powerful interests, of utility plants *scattered over many States and totally unconnected in operation.*" S. Rep. No. 621, 74th Cong., 1st Sess., 55 (emphasis added).

The resulting statutory system left room for the development of economies of large scale, single company operations. One of the stated mandates to the Federal Power Commission was for it to assure "an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources," 16 U. S. C. § 824a. In the face of natural monopolies at retail and similar economies of scale in the subtransmission of power, Congress was forced to address the very problem raised by this case—use of the lines of one company by another. One obvious solution would have been to impose the obligations of a common carrier upon power companies owning lines capable of the wholesale transmission of electricity. Such a provision was originally included in the bill. One proposed section provided that:

"It shall be the duty of every public utility to furnish energy to, exchange energy with, and transmit energy for any person upon reasonable request therefor . . . ." S. 1725, 74th Cong., 1st Sess., § 213.

Another proposed provision was that:

"Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a public utility to make additions, extensions, repairs, or improvements to or changes in its facilities, to establish physical connection with the fa-

cilities of one or more other persons, to permit the use of its facilities by one or more persons, or to utilize the facilities of, sell energy to, purchase energy from, transmit energy for, or exchange energy with, one or more other persons." [2] *Ibid.*

Had these provisions been enacted, the Commission would clearly have had the power to order interconnections and wheeling for the purpose of making available to local power companies wholesale power obtained from or through companies with subtransmission systems. The latter companies would equally clearly have had an obligation to provide such services upon request. Yet, after substantial debate,[3] the Congress declined to follow this path. As the Senate report indicates in discussing § 202 as enacted:

"The committee is confident that enlightened self-interest will lead the utilities to cooperate with the commission and with each other in bringing about the economies which can alone be secured through the planned coordination which has long been advocated by the most able and progressive thinkers on this subject.

"When interconnection cannot be secured by voluntary action, subsection (b) gives the Commission limited authority to compel inter-state utilities to connect their lines and sell or exchange energy. The power may only be invoked upon complaint by a State commission or a utility subject to the act." S. Rep. No. 621, 74th Cong., 1st Sess., 49.

[2] Both of these provisions had identical counterparts in H. R. 5423, 74th Cong., 1st Sess.

[3] Hearings on S. 1725 before the Senate Committee on Interstate Commerce, 74th Cong., 1st Sess. (1935); Hearings on H. R. 5423 before the House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess. (1935).

This legislative history, especially when viewed in the light of repeated subsequent congressional refusals to impose common carrier obligations in this area,[4] indicates a clear congressional purpose to allow electric utilities to decide for themselves whether to wheel or sell at wholesale as they see fit. This freedom is qualified by a grant of authority to the Commission to order interconnection (but not wheeling) in certain circum-

---

[4] See, e. g., S. 350 and H. R. 2101, 88th Cong., 1st Sess., providing that:

"Any certificate issued under the provisions of this subsection authorizing the operation of transmission facilities shall be subject to the condition that any capacity of such facilities not required for the transmission of electric energy in the ordinary scope of such applicant's business shall be made available on a common carrier basis for the transmission of other electric energy."

This bill was re-introduced as S. 1472 and H. R. 2072 in the 89th Congress, 1st Session, and also failed to pass. See also S. 2140 and H. R. 7791, 89th Cong., 1st Sess.

These bills were all reintroduced in the 90th Congress, as was H. R. 12322, proposing an Electric Power Reliability Act that would have specifically provided the Commission with authority to order wheeling. In the 91st Congress, bills to establish an Electric Power Reliability Act were again introduced. Section 3 of that proposed Act included a grant of authority for the FPC to order wheeling, see, e. g., S. 1071, 91st Cong., 1st Sess. Yet another bill, H. R. 12585, 91st Cong., 1st Sess., included a very broad provision establishing open access to transmission networks at reasonable rates.

The proposed Electric Power Reliability Act was reintroduced in the 92d Congress, 1st Session, as S. 294 and H. R. 605. H. R. 12585 from the 91st Congress was also reintroduced, as H. R. 6972, 92d Cong., 1st Sess. Still another bill would have prevented proposed regional bulk-power supply corporations from contracting with an electric utility unless that utility "permit[s] . . . the use of its excess transmission capacity for the purpose of wheeling power from facilities of such corporation . . . to load centers of other electric utilities contracting to purchase electric power from such corporation." S. 2324, H. R. 9970, 92d Cong., 1st Sess., § 103 (c) (1) (B). None of these bills was enacted.

stances. But the exercise of even that power is limited by a consideration of the ability of the regulated utility to function. The Commission may not order interconnection where this would entail an "undue burden" on the regulated utility. In addition, the Commission has

> "no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers." 16 U. S. C. § 824a (b).

As the District Court found, Otter Tail is a vertically integrated power company. But the bulk of its business—some 90% of its income—derives from sales of power at retail. Left to its own judgment in dealing with its customers, it seems entirely predictable that Otter Tail would decline wholesale dealing with towns in which it had previously done business at retail. If the purpose of the congressional scheme is to leave such decisions to the power companies in the absence of a contrary requirement imposed by the Commission, it would appear that Otter Tail's course of conduct in refusing to deal with the municipal system at Elbow Lake and in refusing to promise to deal with the proposed system at Hankinson, was foreseeably within the zone of freedom specifically created by the statutory scheme.[5] As a re-

---

[5] The District Court was persuaded that the restrictions on wheeling contained in Otter Tail's contracts with the Bureau of Reclamation were "in reality, territorial allocation schemes." 331 F. Supp., at 63. I think this finding was clearly erroneous. Territorial allocation arrangements that have run afoul of the antitrust laws have traditionally been horizontal, and have involved the elimination of competition between two enterprises that were similarly situated in the market. *United States* v. *Topco Associates,* 405 U. S. 596; *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593; cf.

tailer of power, Otter Tail asserted a legitimate business interest in keeping its lines free for its own power sales and in refusing to lend a hand in its own demise by wheeling cheaper power from the Bureau of Reclamation to municipal consumers which might otherwise purchase power at retail from Otter Tail itself.

The opinion of the Court emphasizes that Otter Tail's actions were not simple refusals to deal—they resulted in Otter Tail's maintenance of monopoly control by hindering the emergence of municipal power companies. The Court cites *Lorain Journal* v. *United States,* 342 U. S. 143, for the proposition that "[u]se of monopoly power 'to destroy threatened competition' is a violation of the 'attempt to monopolize' clause of § 2 of the Sherman Act." This proposition seems to me defective. *Lorain Journal* dealt neither with a natural monopoly at retail nor with a congressionally approved system predicated on the existence of such monopolies. In *Lorain Journal,* a newspaper in Lorain, Ohio, used its monopoly position to discourage advertisers from supporting a nearby radio station seen by the newspaper to be a competitor. The theory of the case was that competition in the communications business was being foreclosed by the newspaper's exercise of monopoly power. Here,

---

*White Motor Co.* v. *United States,* 372 U. S. 253, 261–264. Otter Tail and the Bureau of Reclamation stand in a vertical, not a horizontal, relationship. Furthermore, though Otter Tail refused to wheel power to towns whose consumers it formerly served at retail, it did not exact from the Bureau a promise that the latter would not provide power to such towns by alternative means. Hence, I cannot see how these contracts operate as territorial-allocation schemes. If Otter Tail had demanded that the Bureau not sell to former Otter Tail customers, or if Otter Tail had combined with other retailers of electricity and undertaken mutual noncompetition agreements, this would be a different case.

by contrast, a monopoly is sure to result either way. If the consumers of Elbow Lake receive their electric power from a municipally owned company or from Otter Tail, there will be a monopoly at the retail level, for there will in any event be only one supplier. The very reason for the regulation of private utility rates—by state bodies and by the Commission—is the inevitability of a monopoly that requires price control to take the place of price competition. Antitrust principles applicable to other industries cannot be blindly applied to a unilateral refusal to deal on the part of a power company, operating in a regime of rate regulation and licensed monopolies.

The Court's opinion scoffs at Otter Tail's defense of business justification. *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365, is cited for the proposition that "[t]he promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct." This facet of the Court's reasoning also escapes me in the case before us, where the health of power companies and the abundance of our energy supply were considerations central to the congressional purpose in devising the regulatory scheme. As noted above, the Commission is specifically prohibited from imposing interconnection requirements that are unduly burdensome or that interfere with a public utility's ability to serve its customers efficiently. The District Court noted that Otter Tail had offered a "so-called 'erosion study' " documenting the way in which its business would suffer if it were forced to wholesale and wheel power to municipally owned companies. The District Court gave little credence to the report's predictions. "But regardless," the court went on, "even the threat of losing business does not justify or excuse violating the law." 331 F. Supp., at 64–65. This question-begging disregard of the economic health of Otter Tail is wholly at odds with the congressional purpose in

specifying the conditions under which interconnections can be required.

This is not to say that Otter Tail's financial health is paramount in all instances,[6] or that the electric power industry as regulated by the Commission is *per se* exempt from the antitrust laws. In the absence of a specific statutory immunity, cf. *Hughes Tool Co.* v. *Trans World Airlines,* 409 U. S. 363, such exemptions are not lightly to be implied, *United States* v. *Philadelphia National Bank,* 374 U. S. 321. Furthermore, no sweeping antitrust exemption is warranted, as it has been in cases involving certain pervasively regulated industries, under the doctrine of "primary jurisdiction."[7]   Cf. *United*

---

[6] In ordering permanent interconnection between Otter Tail and the town of Elbow Lake municipal system, for example, the Commission correctly noted that, "The public interest is far broader than the economic interest of a particular power supplier. . . . The private company's lack of enthusiasm for . . . [the interconnection order] cannot deter us, so long as the public interest requires it." *Elbow Lake* v. *Otter Tail Power Co.,* 46 F. P. C. 675, 678.

[7] The Federal Power Commission, as noted above, only orders interconnection under the provisions of § 202 (b), 16 U. S. C. § 824a (b), though it has broader powers in times of war or other emergency. 16 U. S. C. § 824a (c). The Commission does not normally set rates, though utilities subject to its jurisdiction must file proposed rate schedules with it, and it has the opportunity of assessing the lawfulness of those rates. 16 U. S. C. § 824d. In the event the Commission concludes that any rate or practice is "unjust, unreasonable, unduly discriminatory or preferential," it determines the "just and reasonable rate . . . ." 16 U. S. C. § 824e (a). Under these same provisions, the Commission regulates the terms and conditions of interconnections and wheeling arrangements voluntarily entered into.

The resulting system of regulation is thus more comprehensive than the regulatory apparatus applicable to bank mergers which was held to be insufficient to oust antitrust jurisdiction in *United States* v. *Philadelphia National Bank,* 374 U. S. 321, and the regulatory scheme with respect to broadcasters which similarly failed to displace the antitrust laws in *United States* v. *Radio Corp. of*

*States* v. *Radio Corp of America,* 358 U. S. 334, 346–352. See *Far East Conference* v. *United States,* 342 U. S. 570; *Terminal Warehouse Co.* v. *Pennsylvania R. Co.,* 297 U. S. 500; *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474; *Keogh* v. *Chicago & N. W. R. Co.,* 260 U. S. 156; *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; cf. *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213. Our duty in attempting to reconcile the Federal Power Act with the Sherman Act on the facts of the case before us requires a judgment regarding the "character and objectives" of the regulatory scheme and the extent to which they "are incompatible with the maintenance of an antitrust action." *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 358. "Repeal [of the antitrust laws] is to be regarded as implied only if necessary to make the . . . [Act] work, and even then only to the minimum extent necessary." *Id.,* at 357.

With respect to decisions by regulated electric utilities as to whether or not to provide nonretail services, I think that in the absence of horizontal conspiracy, the teaching of the "primary jurisdiction" cases argues for leaving governmental regulation to the Commission instead of the invariably less sensitive and less specifically expert process of antitrust litigation. I believe this is

*America,* 358 U. S. 334. Nevertheless, the considerable freedom allowed to electric utilities with respect to coordination of service persuades me that the antitrust laws apply to the extent they are not repugnant to specific features of the regulatory scheme. For this reason, litigation and political activities that come within the so-called "sham" exception in *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, might constitute an antitrust violation. Similarly, a genuine territorial allocation agreement might be prohibited under the Sherman Act, see n. 5, *supra.* Were it not for the legislative history noted above, a consistent refusal to deal with municipally owned power companies might also be impermissible under the Sherman Act. For me, however, the legislative history with respect to wheeling and interconnection is dispositive.

what Congress intended by declining to impose common carrier obligations on companies like Otter Tail, and by entrusting the Commission with the burden of "assuring an abundant supply of electric energy throughout the United States" and with the power to order interconnections when necessary in the public interest. This is an area where "sporadic action by federal courts" *can* "work mischief." Cf. *United States* v. *Radio Corp. of America*, 358 U. S., at 350.[8]

Even assuming that Otter Tail's refusals to wholesale or wheel power to Elbow Lake and Hankinson were colorably within the reach of the antitrust laws, I cannot square the opinion of the Court with our recent decision in *Ricci* v. *Chicago Mercantile Exchange*, 409 U. S. 289. Otter Tail's refusal to wholesale or wheel power to Elbow Lake was the subject of two concurrent proceedings—one in the District Court, and another in the Federal Power Commission. It seems to me that the principles of *Ricci*, related to but not identical with the traditional doctrine of "primary jurisdiction," should require a District Court in a case like this one to defer to the Commission proceeding then in progress. Surely the regulatory authority of the Commission with respect to inter-

---

[8] Unlike the situation presented in *R. C. A., supra*, where the regulatory agency filed a brief in this Court disavowing any conflict between its regulatory functions and the operation of the antitrust laws, *id.*, at 350 n. 18, in this case the Federal Power Commission has taken the unusual step of filing a brief as *amicus curiae* in support of Otter Tail. The Commission points out that it was considering an application for interconnection filed by the town of Elbow Lake at the same time this lawsuit was progressing in the District Court. An order requiring long-term interconnection by Otter Tail with the Elbow Lake municipal system was entered by the Commission on September 13, 1971—just four days after the District Court entered judgment. The Commission reads its authority to order interconnection, 16 U. S. C. § 824a, as a grant of exclusive jurisdiction in matters involving interconnection.

connection is at least as substantial as the responsibility of the Commodity Exchange Commission, in *Ricci,* for the implementation of reasonable membership practices by its regulated contract markets. *Id.,* at 310–311 (MARSHALL, J., dissenting). The responsibility of the Commission for "assuring an abundant supply of electric energy throughout the United States" and its authority to order compulsory wholesaling satisfy the three criteria enunciated in *Ricci* for a deferral of antitrust jurisdiction to an administrative agency: (1) that the court must first decide whether the conduct complained of, in light of the regulatory statute, is immune from the antitrust laws; (2) that "some facets of the dispute" are "within the statutory jurisdiction" of the agency; and (3) "that adjudication of that dispute . . . promises to be of material aid in resolving the immunity question." *Id.,* at 302.

With respect to the last of the *Ricci* criteria, it is useful to contrast the cursory treatment given to Otter Tail's business-justification defense by the Court today with the opinion of the Commission ordering permanent interconnection:

> "[W]e cannot disagree with the Examiner's view that Elbow Lake has engaged in 'an ill-advised excursion into the power business.' Given the facts of record before us, it is plain that Elbow Lake's effort has not brought it the rewards it expected; indeed, its first year of operations, during which it perpetuated the rates formerly charged by Otter Tail, resulted in a financial loss. Unlike Otter Tail's earlier service to Elbow Lake, Elbow Lake's own system is of doubtful reliability, as evidenced by its presence before us now. . . . While it is our responsibility to take all possible steps to insure to Elbow Lake's customers a high standard of service

reliability, our terms and conditions must not invite improvident ventures elsewhere.

"We also share the Examiner's view that Otter Tail is legitimately concerned about the possible erosion of its system. If other communities were to follow Elbow Lake's route, and if, having miscalculated the results, they could expect to be rescued by overly-generous interconnection terms, then Otter Tail's fears that it will lose its customers, seriatim, seem to us to be supported. We do not mean by this that we accept a captive market concept, however. . . . The exercise of that [statutory] authority may well require, as it does here, that we order a public utility to interconnect with an isolated municipal system." *Elbow Lake* v. *Otter Tail Power Co.*, 46 F. P. C. 675, 677–678.

The opinion of the Court attempts to sidestep the *Ricci* problem by noting that the Commission has in fact ordered interconnection with Elbow Lake, resulting in the absence of a present actual conflict with the decree entered by the District Court. The Court goes on vaguely to suggest that there will be time to cope with the problem of a Commission refusal to order interconnection which conflicts with this antitrust decree when such a conflict arises.

But the basic conflict between the Commission's authority and the decree entered in the District Court cannot be so easily wished away. The decree enjoins Otter Tail from "[r]efusing to sell electric power at wholesale to existing or proposed municipal electric power systems in cities and towns located in any area serviced by Defendant." [9] This injunction is qualified by a provision that such wholesaling be done at "compensatory" rates and under "terms and conditions which are filed

---

[9] The decree of the District Court is unreported.

with and subject to approval by the Federal Power Commission." The setting of rates, terms, and conditions, however, is but part of the Commission's authority under § 202 (b), 16 U. S. C. § 824a (b). The Court's decree plainly ignores the Commission's authority to decide *whether* involuntary interconnection is warranted under the enunciated statutory criteria. Unless the decree is modified, its future implementation will starkly conflict with the explicit statutory mandate of the Federal Power Commission.

Both because I believe Otter Tail's refusal to wheel or wholesale power was conduct exempt from the antitrust laws and because I believe the District Court's decree improperly pre-empted the jurisdiction of the Federal Power Commission, I would reverse the judgment before us.