**Hans OETIKER, Appellant,**

v.

**JURID WERKE GMBH.**

**Hans OETIKER**

v.

**JURID WERKE GMBH, Appellant.**

Nos. 81–1427, 81–1489.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 13, 1981.
Decided Feb. 19, 1982.

Paul M. Craig, Jr., Washington, D. C., with whom James F. McKeown, Washington, D. C., was on the brief for Hans Oetiker, appellant in No. 81–1427 and appellee in No. 81–1489.

Martin Fleit, Washington, D. C., with whom Michael R. Slobasky, Washington, D. C., was on the brief for Jurid Werke GmbH, appellee in No. 81–1427 and appellant in No. 81–1489.

Before WILKEY and MIKVA, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the Court filed by Chief Judge MARKEY.

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

MARKEY, Chief Judge:

Hans Oetiker (Oetiker) appeals from a judgment of the United States District Court for the District of Columbia dismissing his claim that Jurid Werke GmbH (Jurid) procured U.S. Patent 3,321,811 ('811 patent) by fraud on the Patent and Trademark Office (PTO) and misused the '811 patent in violation of Section 2 of the Sherman Act (15 U.S.C. § 2). Jurid cross appeals the district court's refusal to award it attorneys fees. We affirm.

## Background

Oetiker, a Swiss resident and citizen, is engaged in the manufacture and sale of clamps and couplings in various countries, including the United States.

In 1957, Oetiker and Jurid, a German manufacturer, entered an agreement granting Jurid an exclusive license under Oetiker's clamp patents in West Germany and access to related know-how and trade secrets. According to that agreement, Oetiker had the right to freely use any improvements to the Oetiker clamps made by Jurid and to have the same patented. If Oetiker elected not to apply for patent protection, Jurid was free to do so. However, any patents applied for by Jurid were to be in Oetiker's name and were to become Oetiker's property upon termination of the agreement.

On April 4, 1964, Jurid filed a German Gebrauchsmuster (petty patent) application on a hose clamp. Jurid filed a corresponding application in the United States on March 31, 1965. Corresponding applications were also filed in Britain, France, Sweden, Austria and the Netherlands and a utility patent application was filed in Germany. The U.S. application matured into the '811 patent issued May 30, 1967. On December 7, 1967, the German Patent Office rejected the corresponding German application for lack of invention over disclosures in certain prior patents.

In October, 1972, Oetiker began selling axle sleeve clamps to Volkswagen Werken,

AG (VW), a German automobile manufacturer. Before that time, the German axle sleeve clamp market had been the province of Jurid under its exclusive license from Oetiker. That license agreement was terminated in March, 1972.

In June, 1973, Jurid wrote to VW calling VW's attention to Jurid's ownership of several patents, including the '811 patent, relating to axle sleeve clamps.[1] Jurid states in that letter that "for the hose clamps presently used by [VW] no relevant Oetiker patents but rather only Jurid patents exist."

A year later, on June 14, 1974, Jurid threatened to sue VW for patent infringement, unless settlement was reached by July 8, 1974. VW ignored the letters and Jurid took no further action on the matter.

Oetiker filed this action on November 15, 1974, seeking a declaratory judgment that the '811 patent was: invalid; not infringed; fraudulently procured; and misused to exclude Oetiker from selling clamps in the U.S. and other markets in violation of federal antitrust laws.

On February 6, 1975, Jurid filed a disclaimer of the '811 patent in the PTO and moved to dismiss the invalidity and noninfringement claims as mooted thereby. Jurid also moved to dismiss the misuse claim as a nonfederal pendant claim. The motion to dismiss was granted as to all claims and Oetiker appealed.

On appeal, this court affirmed the dismissal of the invalidity and noninfringement claims as moot, but remanded for consideration of Oetiker's claim that Jurid had procured the '811 patent by fraud sufficient to support a charge of antitrust violation under § 2 of the Sherman Act. *Oetiker v. Jurid Werke GmbH*, 556 F.2d 1 (D.C. Cir.1977).

In Oetiker's original complaint and first amended complaint, the only allegation of fraud was Jurid's alleged failure to inform the PTO of prior art patents relied upon by the German Patent Office in connection with Jurid's corresponding German patent application.

On remand, Oetiker moved for leave to file a second amended complaint saying "that some of the original factual allegations supporting the theory of fraudulent procurement . . . if narrowly construed might be arguably not supported." In the amended complaint, in Oetiker's opposition to Jurid's motion for summary judgment, and in a separate cross-motion for summary judgment, Oetiker advanced new allegations of fraud. He alleged that Jurid wrongly named Karl Thomas, a Jurid employee, as the inventor; that it failed to inform the PTO of the date of the German Gebrauchsmuster; that the invention was inoperative; that Jurid failed to disclose best mode; that it made misrepresentations and nondisclosures concerning two prior art French patents cited by the examiner; that it failed to record an interview with the patent examiner; and that it failed to cite the Tinnerman U.S. Patent 2,335,464 (Tinnerman).

Trial was held May 5–12, 1980. On March 17, 1981, Judge Thomas Flannery entered final judgment for Jurid. In his findings of fact and conclusions of law, Judge Flannery found that each of Oetiker's allegations of fraudulent procurement lacked merit. On April 1, 1981, Judge Flannery denied Jurid's motion for attorneys fees, refusing to find that Oetiker had maintained the litigation in bad faith.

*Issues*[2]

(1) Whether error occurred in finding without merit Oetiker's allegation that Jurid had procured the '811 patent by fraud

---

1. Jurid, though acknowledging that the licensing agreement called for a transfer of relevant patents, says Oetiker did not require that the patents be transferred to him.

2. Jurid raises on this appeal an allegation that personal jurisdiction over it is absent because Oetiker is not an American resident, citing *Riker Laboratories, Inc. v. Gist-Brocades N.V.*, 636 F.2d 772 (D.C.Cir.1980); *Neidhart v. Neidhart S.A.*, 510 F.2d 760 (D.C.Cir.1975). In the earlier appeal, 556 F.2d at 4, this court pointed out that lack of personal jurisdiction can be waived, as it was in this case. We need not, therefore, discuss Jurid's argument respecting a limitation on 35 U.S.C. § 293 (1976).

on the PTO sufficient to support a charge of antitrust violation under § 2 of the Sherman Act.

(2) Whether, after finding no fraudulent procurement, it was error to refrain from considering Oetiker's allegations of fraudulent enforcement.

(3) Whether it was an abuse of discretion to refuse an award of attorneys fees.

## OPINION

The Supreme Court has established that one guilty of fraudulent procurement and attempted enforcement of the patent thus procured may be liable for treble damages to competitors under the antitrust laws. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). In *Walker Process*, the defendant had attempted to enforce a patent allegedly known to be invalid. The Court held that the enforcement of a patent procured by fraud on the PTO may be violative of § 2 of the Sherman Act provided all the other elements necessary to establish a § 2 violation are proved, and that persons injured by that violation may sue for treble damages under § 4 of the Clayton Act.[3]

## I. FRAUDULENT PROCUREMENT

■ Oetiker says on this appeal that Jurid committed fraud in the procurement of the '811 patent by: (1) misleading the U.S. patent examiner on the pertinence of two prior French references cited by the patent examiner during prosecution of the U.S. application and (2) failing to cite U.S. Patent 2,335,464 (Tinnerman) to the PTO.[4]

Respecting (1), Oetiker says that correspondence of Jurid with its patent agents establishes that Jurid believed the French references more pertinent than the art relied upon by the examiner,[5] and that Jurid intentionally misled the examiner by not adequately disclosing the references.

Finding of Fact 64, reads:

64. The court has considered all of the communications among defendant and its U.S. and foreign patent agents in connection with the prosecution of the U.S. '811 patent. These communications do not reveal that defendant believed the French '397 and '312 patents would, or should, have prevented issuance of the '811 patent, nor do the documents reflect any bad faith or intent to deceive or mislead the Examiner.

That finding is not clearly erroneous. The correspondence between Jurid and his German patent attorney, Rau, does not establish that Jurid thought the examiner erred in not relying on the French references. Though the relevancy of those references is discussed in that correspondence and in correspondence between Rau and Jurid's New York counsel, the conclusion reached in those discussions was that the references did not adversely affect patentability.

Oetiker says that the examiner did not appreciate the significance of the references and that Jurid had a duty to ensure that the examiner considered them in greater detail. However, as Finding 64 makes plain, nothing in the Office Action suggests that the examiner misunderstood or misinterpreted the French references. The trial court correctly found that the drawings of the clamps shown in the French patents are clear and would have been easily understood by an examiner working in this art. That the examiner did not specifically apply the French references against the claims of the '811 patent application suggests only that he considered those patents less pertinent than others he found and applied. That the examiner did not apply the references is certainly not an indication that he misunderstood them.

---

3. Because no error occurred in the finding here that the patent was not procured by fraud, we need not and do not discuss allegations related to other elements of a § 2 violation.

4. Because Oetiker limits this appeal to the two assertions stated, we need not and do not dis-

cuss the other six allegations considered and found without merit at the trial.

5. The examiner cited the two French references in his first Office Action, but did not apply them against the claims.

Nor is there evidence that Jurid made any misrepresentations concerning either of the French references. The only direct statements Jurid made concerning the references were in its response to the examiner's Office Action. Those statements were found below to have been true and not misleading to the examiner. Significantly, Jurid stated that the references "pertain to this kind of clamp." As Judge Flannery noted, that statement would hardly have directed the examiner's attention from the references; it would have drawn his attention to them.

Oetiker suggests, erroneously, that Jurid should have discussed specifically how the '811 claims patentably distinguished over the French references. An applicant, however, bears no obligation to distinguish over references of record that are not applied against the claims.

Finally, Oetiker says that error occurred in a failure to call the PTO's attention to the decision of the German Patent Office concerning the French references. Oetiker's evaluation of this original fraud allegation as "arguably not supported" lacks candor. The allegation is unsupportable. The first Office Action on the merits of the German application was not issued until December 15, 1967, several months *after* prosecution of the '811 patent application was closed. As Judge Flannery properly noted: "once a patent issues, the U.S. Patent Office loses all jurisdiction ... thus, there can be no fraud on the Patent Office for failure to cite prior art ... that was discovered only after the issuance of the patent."[6]

▬▬ Regarding (2), the Tinnerman patent, Oetiker says Jurid's June 6, 1966 letter to Rau indicates that Jurid was aware of the Tinnerman patent and its relevance, the patent having been cited in connection with Jurid's corresponding Swedish application. Jurid's failure to cite it to the PTO, says Oetiker, constituted fraud.

Judge Flannery's findings that Jurid did not intentionally or in bad faith withhold the Tinnerman patent, and that Jurid did not believe the Tinnerman patent pertinent or relevant to the clamp of the '811 patent application, are amply supported in the record.

Oetiker relies solely, and inadequately, on the June 6 letter. That letter suggests that Jurid believed his invention distinguishable over Tinnerman and nowhere suggests that Jurid considered Tinnerman more pertinent than the art relied upon by the examiner.

A finding that a patent was procured by fraud must be based on "clear, unequivocal and convincing" evidence. *DeLong Corp. v. Raymond International, Inc.*, 622 F.2d 1135, 1145 (3d Cir. 1980). There must be evidence of a deliberate misrepresentation in the PTO. A good faith judgment not to cite prior art to the PTO, even if erroneous, cannot be fraud. *Deere & Corp. v. Heaston Corp.*, 593 F.2d 956, 960 (10th Cir. 1979). As this court stated on the earlier appeal, it is necessary that there be clear evidence of "specific intent" and that defendant "knowingly and willfully" misrepresented facts to the PTO. 556 F.2d at 8. Judge Flannery properly concluded here that Oetiker "failed to carry the burden of proof and prove by a preponderance of the evidence that the defendant fraudulently procured the patent in issue."

## II. FRAUDULENT ENFORCEMENT

Oetiker says that (a) it was error not to consider an issue of fraudulent enforcement, and (b) that if Jurid did not fraudulently procure the '811 patent, it nonetheless violated the antitrust laws by fraudulently enforcing it, because Jurid knew when it wrote to VW that the '811 patent was invalid (Jurid's applications in Germany and the Netherlands having been rejected and abandoned, respectively) and

---

**6.** As above indicated, there is no evidence to support the argument that Jurid viewed the French references as more pertinent than those applied by the examiner in the PTO, or that those references were in fact more pertinent.

We do not, therefore, reach an issue respecting a duty to inform the PTO, to disclaim, or to seek reissue, when more pertinent art is learned of after issuance of a patent.

that the 1957 agreement immunized Oetiker from any charge of infringement.

### (a) *Failure to Consider*

■ We do not agree that error occurred in not considering Oetiker's fraudulent enforcement allegations. The sole issue on remand was whether the '811 patent was procured by fraud sufficient to predicate a charge of antitrust violation. 556 F.2d at 5–7. Finding no basis for Oetiker's assertions of fraudulent procurement, Judge Flannery correctly dismissed the action.

### (b) *Fraudulent Enforcement*

■ Assuming, without deciding, that a pleading of fraudulent enforcement without fraudulent procurement was permissible, and construing Oetiker's allegations thereof most favorably to him, it is clear that nothing of record supports the assertion that fraudulent enforcement of the type on which a charge of antitrust violation may be based was in any manner here involved. Hence, there is no basis for Oetiker's request that the case be remanded for consideration of that issue.

Oetiker has offered no evidence that Jurid ever enforced the patent, fraudulently or otherwise. His claim is based solely on the June, 1973 and June, 1974 letters Jurid wrote to VW. The first of those letters was a multipaged review of numerous patent and clamp model considerations and of the contractual relations of Jurid and Oetiker. It was informational in character, announcing that Jurid had obtained patents in seven named countries, of which the United States (the '811 patent) was one. The second letter asked for settlement by July 8, 1974, and contained the statement that Jurid would be forced to vindicate its patent rights if no settlement proposal were received. The '811 patent was not referred to specifically in the second letter. Not surprisingly, in view of its size and sophisti-

cation, VW simply ignored the letters. Jurid, far from enforcing the '811 patent, took no further action whatsoever vis-a-vis VW after its second letter.[7] Judge Flannery specifically found no bad faith belief on Jurid's part that the patent was invalid. The letters and the events, or more properly, lack of events, surrounding them constitute neither a threat nor an enforcement sufficient to trigger the antitrust laws. "Patents would be of little value if infringers of them could not be notified of the consequences of infringement or proceeded against in the courts." *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38, 33 S.Ct. 202, 208, 57 L.Ed. 393 (1912).

Precedent confirms the absence here of a basis for a charge of antitrust violation. Oetiker cites three cases, none of which involved an antitrust issue.[8] The cases dealing with a patent enforcement-antitrust relationship require a good deal more than is present here. *Walker Process* involved fraud in procurement. Others have involved an infringement suit as part of an antitrust scheme (e.g., unlawful acquisitions, misrepresentations, covenants not to compete). See, *Kobe Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952) *cert. den.*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952); *Stewart Warner Corp. v. Staley*, 42 F.Supp. 140 (W.D.Pa.1941); *United States v. Besser Mfg. Co.*, 96 F.Supp. 304, 88 USPQ 421 (E.D.Mich.1951) *aff'd*, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063, 93 USPQ 321 (1952). No such conduct is here alleged. Nor is there an allegation that Jurid engaged in any litigation, let alone in a pattern of baseless, repetitive litigation of the type discussed in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The furthest reach in patent enforcement antitrust liability jurisprudence has thus far been reflected in *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979) *cert. den.*, 444 U.S. 1025,

---

7. That VW was totally uninfluenced toward Jurid's product by the letters is reflected in the falling off, after receipt of the letters, of Jurid's portion of VW's clamp purchases, first to 5% and then to 0%.

8. *Solex Labs, Inc. v. Plastic Contact Lens Co.*, 268 F.2d 637 (7th Cir. 1959); *Maytag Co. v. Meadows Mfg. Co.*, 35 F.2d 403 (7th Cir. 1929); *International Industries and Developments v. Farbach Chemical Co.*, 145 F.Supp. 34 (S.D. Ohio 1956).

100 S.Ct. 688, 62 L.Ed.2d 659 (1980), holding that though patent infringement litigation is presumptively brought in good faith, a clear and convincing showing of bad faith sufficient to support a charge of antitrust violation can be made out by establishing that the patentee knew its patent was invalid when it initiated litigation. Here, Jurid initiated no litigation, in bad faith or good.

Under the present circumstances, and without more, Jurid's letters to VW cannot provide a basis for an antitrust action.

### III. ATTORNEYS FEES

Jurid says Oetiker's bad faith initiation and maintenance of the litigation entitles it to reasonable attorneys fees under 35 U.S.C. § 285, which permits such an award in patent cases involving "exceptional" circumstances.

■ The grant or denial of attorneys fees is within the discretion of the trial court. *St. Regis Paper Co. v. Royal Industries*, 552 F.2d 309, 194 USPQ 52 (9th Cir. 1977). Judge Flannery determined that because Oetiker's fraud allegations were neither frivolous nor in bad faith, "exceptional" circumstances were not present. It is immaterial whether this court, were it sitting *de novo*, might consider sufficiently "exceptional" Oetiker's fraud allegations and his effort to convert a no-enforcement scenario into one of fraudulent enforcement. Judge Flannery, who lived with the case from its inception and conducted two related trials, was better positioned to judge the "faith," good or bad, involved in the initiation and maintenance of the suit. Jurid has shown no basis for our holding that an abuse of discretion occurred in denial of its motion for attorneys fees.

### CONCLUSION

We conclude that no error occurred in reaching the determination that the '811 patent was not procured by fraud on the PTO. Judge Flannery did not err in refusing to consider an issue of fraudulent enforcement; nor does the record reflect a basis for such consideration. We hold that Judge Flannery committed no abuse of discretion in refusing to award attorneys fees. Accordingly, the judgment appealed from is affirmed in all respects.