Hans OETIKER, Appellant,

v.

JURID WERKE, G. m. b. H.

No. 75–1897.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 26, 1976.
Decided March 4, 1977.

Paul M. Craig, Jr., Washington, D. C., with whom James F. McKeown, Washington, D. C., was on the brief for appellant.

Martin Fleit, Washington, D. C., with whom Simor L. Moskowitz, Washington, D. C., was on the brief for appellee.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge. ·

LEVENTHAL, Circuit Judge:

This case involves a patentee's potential liability for fraudulent procurement and enforcement of a patent. A Swiss inventor claims that a German manufacturing com-

pany sought a United States patent on certain secrets in violation of an agreement between them, obtained the patent by fraud on the Patent Office, and used it to exclude the inventor from selling a similar good in certain markets. After the complaint was filed, the company disclaimed the patent, and the district court dismissed the action on the grounds that the disclaimer had mooted all federal claims. We reverse on the ground that plaintiff also presented an antitrust claim, which remains for analysis.

## I. FACTS

We take plaintiff's allegations as true. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Plaintiff Hans Oetiker is a resident and citizen of Switzerland. He manufactures various clamps and couplings at facilities located in Switzerland and other countries, including the United States.

Defendant Jurid Werke, G. m. b. H. ("Jurid") is a West German manufacturing company. Plaintiff does not allege that Jurid does business in the United States.

In 1957, Oetiker entered into an agreement with Jurid, pursuant to which he granted Jurid an exclusive license to manufacture and sell certain types of clamps and couplings in West Germany. Oetiker also obligated himself to provide Jurid with technical information, including drawings, concerning his inventions. In return, Jurid promised that improvements made by Jurid on Oetiker's inventions could be patented by Oetiker. If Oetiker did not seek a patent within eight weeks of notification by Jurid, then Jurid was entitled to apply for patent protection. Finally, if the agreement was terminated, and the termination was not solely the fault of Oetiker, Oetiker would become the owner of all patent rights acquired by Jurid on any "improvement" on Oetiker's earlier inventions.

In succeeding years, Oetiker alleges he supplied Jurid with the relevant technical information, gave Jurid's officers and employees free access to Oetiker's facilities in Switzerland, and provided prototypes of new inventions. Although additional agreements were signed in 1962 and 1968, the basic nature of the improvements provision in the 1957 agreement was not altered.

Notwithstanding the agreement, Jurid secretly filed for a German patent on February 1, 1965,[1] and for a United States patent on March 31, 1965,[2] with respect to a clamp falling within the terms of the agreement. The German Patent Office refused to grant the patent on the grounds of lack of invention over certain prior art and this refusal was affirmed by the appropriate German Appellate Tribunal. Oetiker asserts that despite this course of events, Jurid failed to inform the U. S. Patent Office of the prior art on which the German Office relied. The U. S. application matured into the U. S Patent in suit, No. 3,321,811 (" '811 patent"), on May 30, 1967.

In 1969, the exclusive licensing agreement between the parties was terminated.[3] Oetiker built a facility in West Germany which manufactured and sold certain axle sleeve clamps for use in automobiles. Oetiker asserts that in 1974, after his German facility had begun selling these clamps to the German automobile manufacturer Volkswagen Werken A. G., Jurid charged Volkswagen with infringing Jurid's '811 patent by purchasing the clamps from Oetiker. Oetiker further alleges that although this charge was without merit, it caused great concern among Volkswagen officials, who could not be sure which of their cars would be exported to the United States. Oetiker claims that because of these fears, he was ultimately forced to give to Volkswagen certain assurances which were against his interest.[4]

1. Application No. J 27 430 XIII/47f'.

2. Application No. 444,255.

3. The circumstances surrounding the termination are not clear from the pleadings.

4. Perhaps because of difficulties with translation, it is not clear what these assurances are alleged to be. Oetiker appears to claim that he was compelled to promise not to sue Volkswagen, Jurid or certain other unnamed suppli-

On November 15, 1974, Oetiker filed the complaint which initiated this lawsuit. The complaint alleged personal jurisdiction under 35 U.S.C. § 293 (1970),[5] and set forth three counts. Under the first, entitled "Declaratory Judgment," Oetiker asked that the court declare the '811 patent invalid and noninfringed, that he be declared its legal or equitable owner, and that Jurid's employees be enjoined from claiming infringement. Under Count II, entitled "Fraud," Oetiker charged that the patent had been procured by fraud and asked for damages as well as injunctive relief. Under Count III, labelled "Misuse," Oetiker charged that

Jurid was making its claims of infringement in order to deprive Oetiker of certain markets, including the U. S. market, for axle sleeve clamps. This, Oetiker asserted, constituted patent misuse "under U. S. laws and practices" and unfair competition. Oetiker requested as relief treble damages. The whole of this critical count is set forth in the footnote below.[6]

On February 6, 1975, Jurid filed a disclaimer of the '811 patent in the U. S. Patent Office, thereby forever dedicating it to the public. Several weeks later, Jurid filed a motion to dismiss or for summary

---

ers of Volkswagen for infringing on his rights, but it may be that Oetiker simply promised to indemnify Volkswagen in the event that Volkswagen was sued for infringement by Jurid or others.

5. Quoted in note 9 *infra*.

6.          COUNT III
              MISUSE
   Plaintiff hereby realleges paragraphs 1 through 38 of this Complaint and further avers as follows:
   39. This counterclaim relates to the misuse by the Defendant of the '811 Patent and to the unfair competition resulting from such misuse of a patent known to the Defendant to be invalid.
   40. Plaintiff and Defendant are at present direct competitors in the sale of axle sleeve clamps.
   41. The automotive industry represents a major customer in the relevant market for the sale of such axle sleeve clamps.
   42. On information and belief, most, if not all, major manufacturers of automobiles sell their products throughout most of the countries of the world, including the U. S.
   43. On information and belief, the Defendant is using the '811 Patent and other corresponding patents known to it to be invalid, in an effort to oust Plaintiff from certain markets including the U. S. market and/or to deprive Plaintiff of certain markets for its products involving axle sleeve clamps including the U. S. market.
   44. On information and belief the Defendant is aware of patents owned by Plaintiff in various countries of the world which cover clamps or certain aspects of such clamps of the type sold by the Defendant in competition with Plaintiff's axle sleeve clamps.
   45. On information and belief, the Defendant is aware of its need for a license under Plaintiff's patents mentioned in paragraph 44 to sell its clamps in the respective countries.

   46. On information and belief, the Defendant's charge of infringement of said '811 Patent by the use of Plaintiff's axle sleeve clamps on the Volkswagen cars imported into the U. S. is part of a plan on Defendant's part to exact a license from Plaintiff under Plaintiff's patents mentioned in paragraph 44 herein.
   47. On information and belief, the Defendant is aware of the rights of Plaintiff under said '811 Patent and corresponding other patents under the terms of the license agreement of April 15, 1957 and of the addendum agreement but refuses to recognize the same in an effort to exact from Plaintiff a license under Plaintiff's patents mentioned in paragraph 44 herein.
   48. The Defendant's activities and practices, mentioned in paragraphs 46 and 47 herein constitute a clear patent misuse under U. S. laws and practices.
   49. On information and belief, the Defendant's misuse of said '811 Patent and other patents corresponding thereto is intended to deprive Plaintiff of certain markets including the U. S. market and/or to oust Plaintiff from certain markets including the U. S. market and forms part of a general scheme by the Defendant to unfairly compete with Plaintiff in those markets.
   50. The patent misuse mentioned in paragraph 48 herein and the methods of unfair competition practiced by the Defendant, in fact, resulted in certain difficulties on the part of Plaintiff to sell his axle sleeve clamps, all to the detriment of Plaintiff.
   WHEREFORE Plaintiff prays:
   i. That Plaintiff be awarded judgment for damages in an amount to be subsequently determined and trebled for the Defendant's misuse.
   ii. That the Plaintiff be awarded judgment for costs in this suit, reasonable attorney fees and for such other and further relief as may seem proper to this Court.

judgment. Jurid asked that Counts I and II be dismissed as moot, and that Count III be dismissed on the ground that "the Court as a matter of judicial discretion should abstain from exercising jurisdiction over this Count in view of the absence of any federal question jurisdiction on which to predicate pendent jurisdiction." Jurid also asserted that the court lacked personal jurisdiction over it.

In response to Jurid's disclaimer and motion, Oetiker amended his complaint to add a fourth count entitled "Conversion," in which Oetiker argued that Jurid's attempt to disclaim the patent was invalid because Oetiker was the lawful owner.

The district court granted Jurid's motion to dismiss.[7] It held that Jurid's disclaimer had mooted all federal claims,[8] and exercised its discretion so as to decline jurisdiction with respect to the remaining claims in Oetiker's complaint. Its memorandum opinion explained:

> In the case at bar, plaintiff's misuse and conversion claims depend in large part on the licensing agreements between the parties. The agreements are governed by European law and key witnesses and tangible evidence are located in Europe. Further, the instant case has not yet progressed to trial. When all federal counts are dismissed before trial begins, pendent claims should almost certainly be dismissed as well. [citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).]

Oetiker's principal argument before this court is that the district court mistakenly viewed its claim of patent misuse as a state claim, when in fact that Count had stated a viable claim under federal law. Before considering that contention, we note briefly the problem of personal jurisdiction created by this litigation.

## II. PERSONAL JURISDICTION

■ Although an objection to personal jurisdiction was raised in Jurid's motion to dismiss, it was not pressed before the district court, nor argued at all in this court. Lack of personal jurisdiction can be waived, but it is appropriate to discuss the issues briefly because to some extent they interrelate with the issues of subject matter jurisdiction before us.

■ Section 293 [9] enabled plaintiff to obtain personal jurisdiction over the foreign defendant with respect to his claims of patent invalidity and noninfringement. *See Neidhart v. Neidhart S.A.*, 166 U.S.App. D.C. 380, 510 F.2d 760 (1975).

■ In our view, this enabled plaintiff to obtain personal jurisdiction over the defendant with respect to any of his claims that arose out of the same core of operative fact as those claims which clearly fell within the scope of § 293. *Cf. United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (upholding pendent subject matter jurisdiction over nonfederal claims). Precedents upholding the exercise of pendent personal jurisdiction are

---

**7.** The district court noted that "Jurisdiction over the defendant in this case was achieved under 35 U.S.C. § 293, providing for service on non-resident patentees."

**8.** The district court noted in its memorandum that although the defendant could theoretically bring infringement suits for use of the clamp between the date of the patent and the date of the disclaimer, defendant's counsel had stipulated in open court that no such suits would be filed.

**9.** 35 U.S.C. § 293 provides:
§ 293. *Nonresident patentee; service and notice.*
   Every patentee not residing in the United States may file in the Patent and Trademark Office a written designation stating the name

and address of a person residing within the United States on whom may be served process or notice of proceedings affecting the patent or rights thereunder. If the person designated cannot be found at the address given in the last designation, or if no person has been designated, the United States District Court for the District of Columbia shall have jurisdiction and summons shall be served by publication or otherwise as the court directs. The court shall have the same jurisdiction to take any action respecting the patent or rights thereunder that it would have if the patentee were personally within the jurisdiction of the court.

gathered in the footnote.[10] Of course, the district court may have discretion to dismiss the pendent claims where "considerations of judicial economy, convenience and fairness to litigants" so dictate. *Cf. United Mine Workers v. Gibbs, supra* at 726, 86 S.Ct. at 1139. Yet the concept of pendent personal jurisdiction may be helpful in achieving the purposes of § 293 to give American manufacturers relief against harassment by nonresident patentees. *See Neidhart v. Neidhart S.A., supra,* 166 U.S.App.D.C. at 382, 510 F.2d at 762.

After plaintiff's claims of invalidity and noninfringement were mooted by defendant's disclaimer, it might have been argued that the district court should have exercised his discretion so as to dismiss the remaining claims for lack of personal jurisdiction. On the other hand, there was basis to contend that the *Gibbs* criterion of fairness would not permit defendant to use its disclaimer to evade its alleged responsibility for misuse of the federal patent.[11] Under this rationale it would be relevant that the appended claim is a federal rather than a state one.[12]

Since no such propositions were ventilated before the court, we confine ourselves at this time to a ruling that leaves intact the trial court's implied ruling that personal jurisdiction existed with respect to the non-mooted claims.[13]

## III. SUBJECT MATTER JURISDICTION

We cannot, however, accept the district court's course in dismissing for lack of subject-matter jurisdiction, because the reason given—that there remained no federal action—did not take into account plaintiff's allegations and prayer for treble damages in Count III of his complaint. Plaintiff argues that these allegations state a valid claim for relief under federal law.[14] The

---

10. *Robinson v. Penn. Central Co.,* 484 F.2d 553 (3d Cir. 1973); *Schwartz v. Eaton,* 264 F.2d 195 (2d Cir. 1959) (dictum); *Bertozzi v. King Louie Int'l, Inc.,* 420 F.Supp. 1166 (D.R.I.1976); *United States Dental Inst. v. American Ass'n of Orthodontists,* 396 F.Supp. 565, 574–76 (N.D. Ill.1975); *Sohns v. Dahl,* 392 F.Supp. 1208, 1218 (W.D.Va.1975); *Oxford First Corp. v. PNC Liquidating Corp.,* 372 F.Supp. 191, 196 n.15 (E.D.Pa.1974); *Getter v. R. G. Dickinson & Co.,* 366 F.Supp. 559, 566–67 (S.D.Iowa 1973). *See also Travis v. Anthes Imperial Ltd.,* 473 F.2d 515, 529–30 (8th Cir. 1973) (approving exercise of jurisdiction over pendent claims where defendants were served by extraterritorial process).

Professors Moore and Wright and Miller are also of this view. 2 Moore, *Moore's Federal Practice,* ¶ 4.42[1] at 1293.11.12 (1975); 4 Wright and Miller, *Federal Practice and Procedure,* § 1125 at 528 (1969). *Accord,* American Law Institute, *Study of the Division of Jurisdiction Between State and Federal Courts,* 10–11 (Tentative Draft No. 5, 1967).

We believe these authorities are better reasoned than some older cases in other fields of law that disapproved of the concept of pendent personal jurisdiction. *Levin v. Great Western Sugar Co.,* 274 F.Supp. 974, 980 (D.N.J.1967); *Parker v. Baltimore Paint & Chemical Corp.,* 244 F.Supp. 267, 271 (D.Colo.1965); *Wilensky v. Standard Beryllium Corp.,* 228 F.Supp. 703 (D.Mass.1964); *International Ladies' Garment Workers' Union v. Shields & Co.,* 209 F.Supp. 145 (S.D.N.Y.1962); *Lasch v. Antkies,* 161 F.Supp. 851 (E.D.Pa.1958). *See generally* 2 Moore, *supra,* ¶ 4.42[1] at 1293.11 n.44 (1975) (collecting other cases).

11. *Cf. Rosado v. Wyman,* 397 U.S. 397, 402–05 & n.6, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Further, it has not yet been definitively determined whether an action claiming that a patent has been fraudulently procured and used to monopolize a market is within the scope of "action respecting the patent or rights thereunder." *See Neidhart v. Neidhart S.A.,* 166 U.S. App.D.C. at 385 n.10, 510 F.2d at 765 n.10 (distinguishing antitrust cases from licensing dispute).

12. *Cf. Hagans v. Lavine,* 415 U.S. 528, 548–49, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

13. As already noted, defendant did not argue that lack of personal jurisdiction was an additional basis for supporting the judgment.

14. Plaintiff's argument is considerably confused by his references to cases such as *Hensley Equipment Co. v. Esco Corp.,* 383 F.2d 252, 260–61 (5th Cir. 1967) (recognizing patent misuse as a defense to a patent infringement action), and by his very general references to the patent and antitrust laws as the basis for his claim. However, plaintiff's complaint cites 28 U.S.C. § 1337 as a basis of jurisdiction, claims foreclosure from a market in which he was a competitor, and requests treble damages. In addition, appellant's supplemental brief points out that in the absence of discovery, plaintiff's effort to detail its claim of attempted monopolization has been hampered. Thus we understand plaintiff to be asserting a claim under § 2 of the Sherman Act.

most promising foundation for such a claim would be *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). The Court there held that the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present, 382 U.S. at 174, 86 S.Ct. 347, and that a person injured by such a violation could sue under § 4 of the Clayton Act for treble damages, *id.*

Applying the doctrine of *Walker Process* to this case, we find that plaintiff has alleged facts from which a court could ultimately find that the U. S. patent was fraudulently procured. It is less clear, however, that plaintiff has alleged all the necessary elements of a § 2 violation. In particular, it is not clear whether, in a suit for misuse of a fraudulently obtained patent, an allegation concerning the defendant's share of the relevant market for the patented product is a necessary part of a claim of attempted monopolization.

The *Walker Process* opinion does not set out the necessary elements of a claim of "attempted monopolization" under § 2. There is language, however, that appears to suggest that a demonstration of the defendant's share of the relevant market is required:

> To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure [the patentee's] ability to lessen or destroy competition. It may be that the device—knee-action swing diffusers— used in sewage treatment systems does not comprise a relevant market. There may be effective substitutes for the de-

vice which do not infringe the patent. This is a matter of proof, as is the amount of damages suffered by [the complainant].

382 U.S. at 177–78, 86 S.Ct. at 350. Because of this language, courts have interpreted the *Walker Process* opinion as requiring proof of market power in an attempted monopolization case. *E. g., Forbro Design Corp. v. Raytheon Co.,* 532 F.2d 758, 764 (1st Cir. 1976) (patent case); *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 295 n.14 (7th Cir. 1974); *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 285–86 (8th Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973) (patent case); *Moraine Products v. ICI America, Inc.,* 379 F.Supp. 261, 265 (N.D.Ill.1974) (patent case); *Ekco Products, Inc. v. Dare Plastics, Inc.,* 173 U.S.P.Q. 664, 666 (S.D. Ohio 1972) (patent case).

Nevertheless, because of the posture of the litigation in *Walker Process,* that opinion may have another meaning. The district court there had dismissed the petitioner's anti-trust claim on a motion under Fed. R.Civ.Proc. 12(b)(6), on the grounds that only the United States could sue to annul a patent, and the court of appeals had affirmed. 335 F.2d 315 (7th Cir. 1964). Thus the case reached the Supreme Court after only the initial pleadings. The Supreme Court reversed the lower courts with respect to the petitioner's right to sue and held that proof of fraudulent procurement would strip the patentee of his traditional immunity from the antitrust laws. 382 U.S. at 175–77, 86 S.Ct. 347. It then used the language quoted above to describe its need for additional economic information. That this passage was not intended to be a holding is indicated by the following paragraph, which stated:

> As respondent points out, [petitioner] has not clearly articulated its claim. It appears to be based on a concept of *per se*

---

Also lurking in this case is the possibility that a claim is maintainable under *federal* common law, for unfair competition rooted in abuse of a Federal patent. Such a ruling may well emerge, see Cooper, *State Law of Patent Exploitation,* 56 Minn.L.Rev. 313 (1972), but it is not yet supported by precedent, and we do not think the time and place for considering its soundness is in an effort to thrust it forward as a basis for pendent jurisdiction, whether personal or subject-matter jurisdiction.

illegality under § 2 of the Sherman Act. But *in these circumstances, the issue is premature.* As the Court summarized in *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the area of per se illegality is carefully limited. We are reluctant to extend it *on the bare pleadings* and *absent examination of market effect and economic consequences.* (emphasis added.)

382 U.S. at 178, 86 S.Ct. at 351. The Court therefore did not dismiss petitioner's claim. Instead, it concluded that "even though the *per se* claim fails *at this stage of litigation,* we believe that the case should be remanded for [petitioner] to clarify the asserted violations of § 2 and to offer proof thereon." 382 U.S. at 178, 86 S.Ct. at 351 (emphasis added). Thus, *Walker Process* has been read not as a decision defining the elements of a § 2 case, but as an opinion "deferring such a decision until the proper vehicle arrived." *Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 921, 923 (N.D. Calif.1975).[15]

The disagreement over the significance of the *Walker Process* opinion is part of a larger controversy over whether proof of market share ought to be a necessary element of a claim of attempted monopolization under Sherman § 2.[16] The prevailing view is that a plaintiff must establish a "dangerous probability" of successful monopolization [17] and therefore must define the relevant market and show that the defendant exercises some control over it.[18]

**15.** This view of the *Walker Process* decision has been adopted by several commentators. Adelman & Brooks, *The Integrity of The Administrative Process, Sherman § 2 and Per Se Rules—Lessons of Fraud on the Patent Office,* 19 Wayne Law Rev. 1, 10–11 (1972); Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two,* 72 Mich.L.Rev. 373, 415–16 (1974); Blecher, *Attempt to Monopolize under Section 2 of the Sherman Act: "Dangerous Probability" of Monopolization Within the "Relevant Market,"* 38 Geo.Wash.L.Rev. 215, 219–20 (1969).

Further support for this interpretation of the *Walker Process* decision has been found in that decision's citation to the Court's opinion in *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). In that opinion the Court refused to hold illegal *per se,* on motion for summary judgment, a manufacturer's imposition of territorial restraints on its dealers. The Court explained that "we know too little of actual impact of [these restraints] to reach a conclusion on the bare bones of the documentary evidence before us." 372 U.S. at 261, 83 S.Ct. at 701. Four years later, on the basis of the full record presented in *United States v. Arnold Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Court embraced a *per se* rule encompassing the facts involved in *White Motor.* Thus the Court's citation to *White Motor* in *Walker Process* suggests that the Court was exercising caution in the face of an incomplete record rather than definitively rejecting the *per se* rule. Adelman & Brooks, *supra,* at 10–11.

**16.** *See generally* Cooper, *supra* note 15; Blecher, *supra* note 15; Note, *Attempt to Monopolize under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case,* 73 Colum.L.Rev. 1451 (1973); Turner, *Antitrust Policy and the Cellophane Case,* 70 Harv.L.Rev. 281 (1956).

**17.** The phrase was first used—somewhat ambiguously—in *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). The Supreme Court quoted from a jury instruction incorporating the "dangerous probability" requirement in *American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Other Supreme Court decisions, however, contain contrary indications. *See United States v. E. I. duPont DeNemours & Co.,* 351 U.S. 377, 395 n.23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Columbia Steel Co.,* 334 U.S. 495, 532, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *United States v. Yellow Cab Co.,* 332 U.S. 218, 226, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). *See* Note, *supra* note 16, at 1452–59.

**18.** *E. g., Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975); *E. J. Delaney Corp. v. Bonne Bell, Inc.,* 525 F.2d 296, 305–06 (10th Cir. 1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976); *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs, Inc.,* 508 F.2d 547, 550–55 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 295 & n.14 (7th Cir. 1974); *Kreager v. General Electric Co.,* 497 F.2d 468, 471 (2d Cir. 1974), *cert. denied,* 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 284–86 (8th Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 207 (5th Cir. 1969).

The Ninth Circuit has taken a different view—that although evidence of market share may be relevant, a "dangerous probability of success" can be inferred from a specific intent to set prices or exclude competition in a portion of the market without a legitimate business purpose.[19]

The prevailing view has a number of advantages. Because of the largely fictive character of "specific intent to monopolize,"[20] and the general tendency of all competitive behavior to injure weaker competitors,[21] it is often difficult to distinguish between an illegal intent to monopolize and a lawful intent to compete.[22] A requirement that market power be shown forces the courts to consider the market setting in which the challenged behavior took place, evidence which may illuminate both the actor's intent and the anticompetitive consequences of his conduct.[23] Such a requirement also tends to limit the application of the Sherman Act to those situations in which the potential harm from an anticompetitive practice is greatest and to those already powerful companies which have the least need for a broad range of competitive tactics.[24] Nevertheless, judicial adoption of the prevailing view may leave lacunae in the coverage of the antitrust laws—types of single firm behavior that are anticompetitive and yet not subject to federal restraint.[25]

We do not think it necessary, in order to decide the case before us, to resolve the larger controversy over the necessary elements of a claim of attempted monopolization. We note initially that Sherman § 2 claims based on the fraudulent procurement of a patent may well be governed by a different rule. In a *Walker Process* situation, the plaintiff is always required to prove that the defendant "knowingly and willfully" misrepresented facts to the Patent Office. 382 U.S. at 177, 86 S.Ct. 347. Thus there must of necessity be reasonably clear evidence of specific intent. Moreover, there is some evidence of exclusionary power in the very fact that the defendant holds a patent in the marketed good. Professor Cooper, who is generally supportive of judicial analysis of market setting, points out the special characteristics of fraudulent procurement cases:[26]

[T]he case for imposing liability on a firm that tries to enforce a patent known to have been fraudulently procured verges on the overwhelming. It is extraordinarily hard to conjure up the competitive advantages of deliberate fraud. The effort to enforce the patent in itself reflects the judgment of the firm that some commercial gain can be reaped from the effort. The impact of the patent on rivals in the marketplace may easily reach far beyond the limits that a court would ultimately place on it; ignorance, uncertainty as to eventual judicial interpretation, the great cost of patent litigation, the ease of accepting license arrangements that have been accepted by most competing firms, and the disastrously broad effects frequently produced by threats against customers of the coerced firm all contribute to this result. Although the brocard that a patent is a legally conferred monopoly ordinarily

19. *E. g., Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8, 11–12 (9th Cir. 1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir. 1964), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

20. *See* Cooper, *supra* note 15, at 398; Hawk, *Attempts to Monopolize—Specific Intent as Antitrust's Ghost in the Machine*, 58 Cornell L.Rev. 1121, 1171–72 (1973).

21. *See* Hawk, *supra* note 20, at 1154.

22. *See* Cooper, *supra* note 15, at 435–50; Hawk, *supra* note 20, at 1154.

23. *See* Cooper, *supra* note 15, at 400–01, 449; Hawk, *supra* note 20, at 1154–55.

24. *See* Cooper, *supra* note 15, at 401.

25. Note, *supra* note 16, at 1462.

26. Cooper, *supra* note 15, at 416–17. Professor Hawk, also a supporter of the "dangerous probability" requirement in most cases, similarly believes that patent misuse cases may be different because of "the monopoly power inherent in patents." Hawk, *supra* note 20, at 1170.

carries precious little value, certainly an attempt to enforce a fraudulently obtained patent would justify taking the bad actor at the full value of its own judgment and imposing monopolization liability for misuse of rights falling into an otherwise valid category of "monopoly." While these considerations may not justify dispensing with an analysis of market setting, they may support other means of showing a "dangerous probability of success" than a simple demonstration of market share.[27]

The status of this litigation, however, does not permit us to give full consideration to this problem. This case has reached only the initial stage of the pleadings. The record affords no information concerning the economic or psychological impact of a fraudulently procured patent on the relevant competitors. For this reason, we think that the appropriate procedure here is the one that the Supreme Court employed in *Walker Process*—a remand of the case so that the record may be further developed and clarified. Hence we do not at this time dismiss plaintiff's complaint for its failure to define a relevant market and specify market shares. The district court may permit the lawsuit to progress to a point where plaintiff's claim can be fully analyzed in its market setting.

## IV. CONCLUSION

We remand for consideration of whether plaintiff has a viable federal antitrust claim.[28] This does not necessarily require a trial. We express no opinion on the point beyond noting that it remains open to the district court, after further pleading and discovery, to conclude that defendant is entitled to summary judgment for inability of plaintiff to establish even a disputable claim of attempted monopolization.[29]

27. *See* Note, *Attempt to Monopolize under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case*, 73 Colum.L. Rev. 1451, 1473–75 (1973).

28. If so, he may have a claim for pendent subject-matter jurisdiction over any nonfederal claims that arise from the same "common nucleus of operative fact", *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16

L.Ed.2d 218 (1966), a matter on which we make no comment.

29. We have also refrained from considering such issues on the merits as whether defendant's action(s) relate to an identifiable market affecting the interstate or foreign commerce of the United States.