# Funding of Attorney Fee Awards Under the Equal Access to Justice Act

Under the Equal Access to Justice Act, the authority and responsibility of an agency adjudicative officer or judge to make an award of attorney fees against the United States does not depend upon the availability of appropriated funds to pay the award. If no appropriated funds are available to pay an award, it remains an obligation of the United States until sufficient funds are appropriated.

Section 207 of the Equal Access to Justice Act precludes payment of a fee award against the United States from the judgment fund without some additional legislative action However, under the funding provision of the Act, an agency's unrestricted general appropriation is available to pay such awards.

Congress intended agencies to bear the major burden of paying fee awards under the Act from their own general appropriation, so as to encourage more responsible agency behavior, and an agency thus has only limited discretion to decline to pay such awards.

March 23, 1982

## MEMORANDUM FOR THE GENERAL COUNSEL, DEPARTMENT OF TRANSPORTATION

The Deputy Attorney General has asked me to respond to your request for an opinion on several issues relating to the funding provisions of the Equal Access to Justice Act, Pub. L. No. 96-481, Tit. II, 94 Stat. 2325 (the Act).[1] Briefly, you wish to know whether fees and expenses may be awarded under 5 U.S.C. § 504 (Supp. V 1981) and 28 U.S.C. § 2412(d) (Supp. V 1981), as added to the United States Code, respectively by §§ 203(a)(1) and 204(a) of the Act, and whether such awards may be paid, in the absence of an express appropriation by Congress for that purpose.[2]

At the outset, we would emphasize that the funding provisions of the Act are *sui generis* and ambiguous. Their legislative history, while somewhat helpful in illuminating their intended meaning, does not definitely resolve all the questions which their ambiguity creates. With this caveat, we conclude, for reasons set

---

[1] Section 203 of the Act (94 Stat. 2325) amends Title 5 of the United States Code by adding a new § 504. The funding provision of that section is 5 U S.C. § 504(d)(1). Section 204 of the Act amends 28 U.S.C § 2412. That section, as amended, contains three funding provisions, 28 U.S.C §§ 2412(c)(1), (c)(2), and (d)(4)(A) We understand that your request relates only to 5 U S C. § 504(d)(1) and 28 U S.C § 2412(d)(4)(A) as they are qualified by § 207 of the Act. This opinion will not discuss 28 U S.C. §§ 2412(c)(1) or (c)(2), neither of which are of concern to you.

[2] A second question posed in your November 17 memorandum, relating to the award of fees in adjudications under § 609 of the Federal Aviation Act of 1958, is separately addressed in an opinion of this date. [*See* p 197, *infra.*]

forth below, as follows: (1) the authority to make fee awards to a prevailing party under the Act does not depend upon there being funds available to pay those awards; (2) § 207 of the Act (94 Stat. 2330) prevents payment of awards from the judgment fund[3] without a specific advance appropriation; (3) awards *may* be paid by agencies from unrestricted appropriations; and (4) a reasonable amount from the unrestricted appropriations of an agency *must* be allocated to the payment of awards for fees and expenses.

## I. Authority to Make Awards

Section 504(a)(1) of Title 5 provides for an award of fees in agency adjudications in the following terms:

> An agency that conducts an adversary adjudication *shall award*, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency as a party to the proceeding was substantially justified or that special circumstances make an award unjust. (Emphasis added.)

Section 2412(d)(1)(A) of Title 28 provides for fee awards in certain judicial proceedings involving the United States in similar mandatory terms:

> Except as otherwise specifically provided by statute, a court *shall award* to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust. (Emphasis added.)

Under both of these sections, awards for fees and expenses, if sought, must be made to those who qualify. Uncertainty as to the source of funding for such awards in no way restricts the authority of agency adjudicative officers or judges, respectively, to make them. There is nothing in the language of these two sections, or elsewhere in the Act, which conditions the authority to make awards under it on Congress' making available money to pay them from one source or another, or, indeed, from any source. Even in the complete absence of appropriations, the law, unless amended or repealed, would require that the awards be made. *See generally New York Airways Inc.* v. *United States,* 369 F.2d 743

---

[3] By payment from the judgment fund, we mean payment from the Treasury in accordance with the procedures set forth in 28 U S C §§ 2414 and 2517 (1976 & Supp. V 1981), under the authority of the permanent, indefinite appropriation for judgments against the United States established by 31 U.S.C § 724a (Supp. V 1981). We use "judgment fund" as a shorthand rendition of that process and source throughout this opinion

(Ct. Cl. 1966).[4] Once made, they would remain obligations of the United States until satisfied.[5] They could, of course, remain unsatisfied forever if Congress never acted to authorize their payment, but history suggests that such obligations usually are paid.[6]

## II. Authority to Pay Awards

We turn now to the provisions pertaining to payment of awards under the Act to determine whether and how these awards may be paid. As relevant here,[7] the funding provisions for awards in administrative and judicial actions are essentially identical:

> Fees and other expenses awarded under this section may be paid by any agency over which the party prevails from any funds made available to the agency, by appropriation or otherwise, for such purpose. If not paid by any agency, the fees and other expenses

---

[4] At the time of this writing we know of several fee awards which have been made under authority of the Act, though in a number of other cases courts have considered applications for fee awards. *See Florida Farm Workers Councils* v. *Donovan* (No. 81-1453, D C. Cir. Dec. 29, 1981); *Photo Data* v. *Sawyer,* 533 F.Supp 348 (D.D.C. 1982); *Berman* v. *Schweicker,* 531 F.Supp. 1149 (N D. Ill 1982); *Arvin* v. *United States,* No. 81-6476, (S.D. Fla Feb. 10, 1982); *United States* v. *Howard Pomp,* 538 F.Supp. 513 (M.D.Fla 1982); *Costantino* v. *United States,* 536 F.Supp. 60 (E.D Pa. 1981). *See also Alspach* v. *District Director,* 527 F.Supp. 225, 527 F.Supp. 225 (D Md 1981), *Matthews* v *United States,* 526 F.Supp 993 (M D.Ga 1981); *Wallis* v. *United States,* No 453-79c (Ct. Cl. Nov. 25, 1981). In none of these cases has the court questioned whether its authority to make an award might depend upon the availability of funds to pay it Nor, in resisting an award of fees in these cases, has this Department suggested that the validity of the award depends in any way upon the prior availability of funds to satisfy it.

[5] Once the award of fees and costs has become final in the sense that the deadline for an appeal has passed and the judicial proceedings have been terminated, Congress may not constitutionally eliminate the liability of the United States under the final judgment. *See McCullough* v *Virginia,* 172 U.S 102, 123–24 (1898) ("It is not within the power of a legislature to take away rights which have been once vested by a judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of the legislature to disturb the rights created thereby ceases"). *See also Pennsylvania* v *Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 431 (1856); (allowing Congress to overturn final judgment requiring removal of bridge as obstruction to navigation, but stating "if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress"); *Hodges* v. *Snyder,* 261 U.S 600, 603–04 (1923) ("a suit brought for the enforcement of a public right . . . even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced; although, in so far as a private right has been incidentally established by such judgment, *as for special damages to the plaintiff or for his costs,* it may not be thus taken away") (emphasis added); *Daylo* v. *Administrator of Veterans' Affairs,* 501 F.2d 811 (D.C. Cir. 1974); *Commissioners of Highways* v. *United States,* 466 F. Supp. 745, 764–65 (N.D. Ill. 1979) ("It is clear that the River and Harbor Act of 1958 could not . . . interfere with plaintiffs' rights under the condemnation decrees"); *Battaglia* v. *General Motors Corp.,* 169 F 2d 254, 259 (2d Cir. 1948) (Congress may eliminate or modify claims, "so long as the claims, if they were purely statutory, had not ripened into final judgment"). In our view, these cases compel the conclusion that once the award of fees and costs under the Act has become final, the prevailing party has a "vested right" to them, and Congress may not remove that right without violating the Fifth Amendment. This conclusion is not altered by the fact that, under § 203 of the Act, the order of fees and costs is rendered by an agency rather than a court. The rule prohibiting takings of "vested rights" depends on the finality of the order in favor of the litigant, not on any interference with the judicial function.

[6] We are informed by the General Accounting Office that the instances in this century in which Congress has failed or refused to make the appropriations necessary to pay in full an adjudicated claim against the United States can be counted on the fingers of one hand

[7] Other provisions of the Act waive sovereign immunity for purposes of common law and statutory exceptions to the "American rule" on fee-shifting, *see* 28 U S.C § 2412(b), and provide that fees awarded against the United States in such cases ordinarily will be paid out of the judgment fund. If an agency is found to have acted in bad faith, the fee award is to be paid by the agency from its own funds 28 U S C § 2412(c)(2). The provisions of the Act discussed in this opinion extend the government's liability to a fee assessment well beyond the limits imposed by the common law and other existing statutes, and are effective only for a three-year period

shall be paid in the same manner as the payment of final judgments is made pursuant to section 2412 [and 2517] of title 28, United States Code.

5 U.S.C. § 504(d)(1). *See also* 28 U.S.C. § 2412(d)(4)(A). The language and structure of these provisions, particularly the words "may," "or otherwise," and "for such purpose" in the first sentence, and the existence of the second sentence, give rise to two legal questions:

1. Which funds appropriated to an agency *may* be used to pay awards for fees and expenses?

2. Which funds, if any, appropriated to an agency *must*, as a matter of law, be used to pay awards for fees and expenses?

Before discussing these questions, however, we will consider the effect of § 207 of the Act, which qualifies both funding provisions in the following terms (94 Stat. 2330):

The payment of judgments, fees and other expenses in the same manner as the payment of final judgments as provided for in this Act is effective only to the extent and in such amounts as are provided in advance in appropriations Acts.

A. *Background*

The funding provisions of the Act, as finally adopted, were developed by the House Committee on the Judiciary in response to a prior Senate version of the bill.

In 1979, the Senate passed its version of what ultimately became the Act. That bill, S. 265, 96th Cong., 1st Sess. (1979), contained funding provisions which were unambiguous. Fees and expenses were to be paid "by the particular agency over which the party prevail[ed] from any sums appropriated to such agency, except that no sums [were to be] appropriated to any such agency specifically for the purpose of paying fees and other expenses." *Id*. at § 2(5). The bill anticipated that "since no monies would be appropriated specifically to pay for awards of fees and expenses," that is, agency budgets would not be augmented for that purpose, agencies would be required to reprogram funds from other activities. S. Rep. No. 253, 96th Cong., 1st Sess. 18 (1979) [hereinafter cited as Senate Report]. "This fiscal responsibility [was] intended to make the individual agencies and department [sic] accountable for their actions." *Id*. at 21. It was also to "provide a quantitative measure of agency error which should encourage review of its practices and its regulations." *Id*. at 18.

Hearings were held on the Act, including the funding provisions, in the House before both the Committee on the Judiciary and the Committee on Small Business.[8] The Committee on Small Business reported out a bill, H.R. 6429,

---

[8] The Committee on the Judiciary held hearings on S. 265. Before the Committee on Small Business, S. 265 was incorporated into H R. 6429 as Title II of that bill.

96th Cong., 2d Sess. (1980), the funding provisions of which were substantively identical to those of S. 265. That Committee believed, as had the Senate Committee on the Judiciary, that placing the fiscal responsibility for payment of fees and expenses on the agencies would make them more accountable for their actions. H.R. Rep. No. 1005, 96th Cong., 2d Sess. (Pt. I) 11 (1980). The House Committee on the Judiciary, however, took the position that the Senate provision restricting the appropriation of funds for the payment of fees and expenses was "unduly punitive" and believed that it might result in "a forced appropriation." H.R. Rep. No. 1418, 96th Cong., 2d Sess. 12 (1980) [hereinafter cited as "House Report"]. Thus, to "insur[e] that the prevailing party will be awarded a fee if it meets the requirements in the bill," *id.*, the House Committee on the Judiciary softened the Senate provision, adopting the language eventually enacted.

The Act was never considered by the full House as an independent piece of legislation. Rather, it was added, in conference, to a bill to amend the Small Business Act, H.R. 5612, and first reached the House floor as a part of the conference report. During the House debate on the conference report, the Act was subjected to a point of order. The objection on the point of order, that the funding provisions of the Act would open the judgment fund to new burdens and thus would, in effect, be an appropriation on an authorization, was resolved by the addition of § 207. 126 Cong. Rec. 28638-42 (1980).

*B. Section 207*

Section 207 of the Act, quoted above, was clearly intended to qualify the second sentence of the funding provisions, "If not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made in accordance with sections 2414 and 2517 of [Title 28]." As indicated above, § 207 was added to the Act on the House floor in response to a point of order to the conference report.[9] The point of order, which at first was sustained, 126 Cong. Rec. 28638 (1980), was overruled only after the addition of § 207 to the Act. *Id.* at 28642. Contemporaneous discussion on the House floor shows that § 207 was specifically intended to ensure that such payments could

---

[9] The point of order, as summarized by the Speaker pro tempore, was

> that the conference report on the bill H.R. 5612 contains provisions of the Senate amendment constituting appropriations on a legislative bill in violation of clause 2, rule XX, which prohibits House conferees from agreeing to such provisions without prior authority of the House
>
> The provisions in title II [in] question authorize appropriations to pay court costs and fees levied against the United States, but also provide that if payment is not made out of such authorized and appropriated funds, payment will be made in the same manner as the payment of final judgments under sections 2414 and 2517 of title 28, United States Code. Judgments under those sections of existing law are paid directly from the Treasury pursuant to section 724a of title 31 of the United States Code, which states that there are appropriated out of the Treasury such sums as may be necessary for the payment of judgments, awards, and settlements under section 2414 and 2517 of title 28. Thus the provision in the Senate amendment contained in the conference report extends the purposes to which an existing permanent appropriation may be put and allows the withdrawal directly from the Treasury; without approval in advance by appropriation acts, of funds to carry out the provisions of title II of the Senate amendment.

126 Cong. Rec. 28638 (1980).

not be made under the appropriations authority of 31 U.S.C. § 724a (Supp. V 1981), the source of authority for what is commonly known as the judgment fund. The effect of § 207 is, and was intended to be, that the promise of the second sentence may be fulfilled only by additional congressional action in the form of legislation. *See generally* 126 Cong. Rec. 28642 (1980) (remarks of Representative Smith). We believe the conclusion is inescapable that awards for fees and expenses not paid by agencies under the authority of the first sentence of the funding provisions may not be paid from the Treasury under the authority of the second unless Congress passes a law.[10]

## C. The Funding Provisions

For the sake of convenience and for ready reference, we quote the funding provision again (§ 204(a), 94 Stat. 2329):

> Fees and other expenses awarded under this section may be paid by any agency over which the party prevails from any funds made available to the agency, by appropriation or otherwise, for such purpose. If not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made in accordance with section 2414 and 2517 of this title.

The word "may" in the first sentence, at a minimum, authorizes an agency to pay awards for fees and expenses in some circumstances. The question is whether the phrase "for such purpose," modifying "funds available," restricts those circumstances to instances in which monies have been appropriated to the agency specifically to pay such awards. We think not. The linchpin of our analysis is the word "otherwise."

As reported by the Senate and the House Committee on Small Business, the funding provisions would have required that an agency "shall" pay awards "from any sums appropriated to such agency" and would have prohibited the appropriation of monies to an agency for that specific purpose. To have complied with those provisions, had they been enacted, an agency would have been required to allocate or reprogram monies for that purpose from its general appropriation. The Senate Committee on the Judiciary so recognized. Senate Report at 18. The House Committee on the Judiciary changed "shall" to "may," permitted appropriations to an agency, and provided for the payment of awards from funds made available for that purpose by appropriations, "or otherwise." That Committee explained: "Funds may be appropriated to cover the costs of fee awards or may otherwise be made available by the agency (*e.g.*, through reprogramming)." House Report at 16, 18–19. Thus, both Judiciary Committees and the House Committee on Small Business recognized and expressed the intent

---

[10] The law could take the form of a specific appropriation for that purpose or it could repeal or amend § 207 in some way to make 31 U S C § 724a a viable source

that funds not specifically appropriated for the payment of fee awards would be available to be reprogrammed (or allocated) for that purpose. This intent was, we believe, ultimately effectuated through specific inclusion in the funding provisions of the phrase "or otherwise," to affirm an agency's authority to allocate or reprogram general appropriations to pay awards for fees and expenses (*i.e.*, for "such purpose").[11]

The more difficult question is whether an agency is obligated, as opposed to authorized, to allocate or reprogram any of its unrestricted, general appropriation for the payment of fees and expenses awarded under 5 U.S.C. § 504 and 28 U.S.C. § 2412(d) (Supp. V 1981).[12] The argument against any such obligation is primarily textual. The first sentence of the funding provisions provides that agencies "may" make payments from their own funds, in contrast to the mandatory "shall" of the Senate version. Read together with the second sentence, which offers the judgment fund as an alternate source of funds to pay awards, the provision might be viewed as indicative of a flexible system in which complete discretion has been vested in the agencies whether to pay awards from their own funds or to refer them for certification by the Comptroller General and payment from the Treasury. The textual argument is buttressed by reference to the broad principle that when Congress appropriates generally in so-called "lump sum" appropriations, it does so with full awareness that it is vesting in agencies complete discretion to allocate the unrestricted funds, including the discretion to "zero-budget" a particular authorized program. *Cf. McCary v. McNamara*, 390 F.2d 601 (3d Cir. 1968).

An equally plausible reading of the text of the funding provision is that the term "may" was intended merely to vest some, but not unlimited, discretion in the agencies to pass responsibility for the payment of some, but not all, awards on to the general Treasury. It would follow from this reading that an agency could be required to devote at least some of its otherwise available funds to the payment of fee awards under the Act. A review of the Act's legislative history shows this to be the correct reading.

---

[11] It is a well settled principle of law that a lump sum appropriated for an agency's general programs and activities may be used by the agency for any otherwise authorized purpose, even if the legislative history of the appropriation statute prescribes specific priorities for allocating funds among authorized activities. *See, e.g., In re Newport News Shipbuilding and Drydock Co.*, 55 Comp. Gen. 812, 819–21 (1976); *In re LTV Aerospace Corp.*, 55 Comp. Gen. 307, 318–19 (1975). The absence of specific limitations or prohibitions in the terms of an appropriations statute implies that Congress did not intend to impose restraints upon an agency's flexibility in shifting funds within a particular lump sum account among otherwise authorized activities or programs—unless of course Congress has in some other law specified that funds from the appropriation in question should be spent (or not, as the case may be) in a particular manner. *See* Fisher, *Reprogramming of Funds by the Defense Department*, 36 Journal of Politics 77, 78 (1974). In an analogous situation, if an agency runs short of funds during the course of a fiscal year, the courts have recognized that an agency head's discretion to reprogram funds among authorized programs under a lump sum appropriation is limited only if a specific statutory directive requires the expenditure or distribution of funds in a particular manner. *See, e.g., City of Los Angeles v Adams*, 556 F.2d 40, 49–50 (D.C. Cir. 1977):

> If Congress does not appropriate enough money to meet the needs of a class of beneficiaries prescribed by Congress, and if Congress is silent on how to handle this predicament, the law sensibly allows the administering agency to establish reasonable priorities and classifications.

The Supreme Court, in *Morton v. Ruiz*, 415 U.S. 199, 230–31 (1974), has affirmed an agency head's "power to create reasonable classifications and eligibility requirements in order to allocate the limited funds available to him."

[12] It is clear, of course, that funds appropriated specifically to pay awards for fees and expenses would have to be spent by agencies for that purpose unless rescinded pursuant to the Impoundment Control Act of 1974, 31 U.S.C. § 1400 *et seq*.

In the first place, the substitution of "may" for "shall" can be explained in purely grammatical terms. The House Judiciary Committee's amendment of the Senate language had two intended effects: first, to authorize specific appropriations to agencies for fee awards; and, second, to permit the payment of awards from the judgment fund in at least some cases.[13] As a matter of both grammar and substance, some element of discretion had to be introduced into the wording of the funding provisions to achieve the latter effect.

Nothing affirmative in the legislative history indicates that either the House or the Senate intended or understood that the modifications made by the House Committee on the Judiciary in the funding provisions would vest unlimited discretion in agencies whether to use their funds to pay awards. The only indicators are to the contrary. Representative Kastenmeier, the prime mover behind the modifications, had a restricted view of the purpose for which discretion was vested. He explained on the House floor: "We have changed the funding for attorneys' fees to prevent the disassembling of an agency based on one lost case." 126 Cong. Rec. 28647 (1980). The view of the conferees was equally parsimonious:

> The conference substitute directs that funds for an award and [sic]
> fees and other expenses *to come first* from any funds appropriated
> to any agency . . . (emphasis added).

H.R. Conf. Rep. No. 1434, 96th Cong., 2d Sess. 24, 27 (1980). Thus, the only statements in the legislative history related to agency discretion indicate that Congress intended that the funding arrangement would ensure that the bulk of awards would come from agency funds. The discretion envisioned was to refer prevailing parties to the general Treasury only when making an award out of agency funds would be a very heavy financial blow to the agency (*i.e.*, cause its "disassembly").

The direct, although admittedly sketchy, evidence that Congress intended agencies to have only limited discretion not to pay awards from their own funds is supported circumstantially by one of the major expressed intentions of Congress in adopting the Act. This is the same intent that inspired the original Senate version of the funding provisions. It is an intent which is evident throughout the legislative history in both the House and the Senate, and which was best expressed by Senator Thurmond in his statement on the adoption of the conference report, a report described by Senator DeConcini as not in essence "at variance with the concept and premise of S. 265 as originally passed by the Senate." 126 Cong. Rec. 28103 (1980). Senator Thurmond observed:

> The second purpose of this legislation is to encourage the
> agency to be as careful as possible in the exercise of its regulatory
> powers and to be more responsive to citizen needs. The implicit
> assumption in the approach taken by this legislation is that affect-

---

[13] We note that the House Committee on the Judiciary's version was developed before § 207 was added to the Act

211

ing the "pocketbook" of the agency is the most direct way to assure more responsible bureaucratic behavior.

*Id.,* at 28106. There is no indication that the House modifications in the Senate funding provisions were intended to undermine this basic purpose of the Act. Rather, the House Report theorized that "fee shifting becomes an instrument for curbing excessive regulation and the unreasonable exercise of Government authority." House Report at 12.

We believe that this legislative history demonstrates Congress' belief that the payment of some awards would come from agency funds either specifically appropriated to the agencies or allocated to this program from lump sum appropriations for all an agency's general activities. Thus, we have little reason to doubt that Congress, in accepting the language reported by the House Committee or the Judiciary on this point, assumed that payment for at least some awards would be available from general lump sums appropriated to the various agencies against whom awards were entered.

Given this apparent intent, the question is whether the intent and the language of the funding provisions is sufficient to overcome the presumption that agencies are generally free to zero-budget authorized programs funded by a lump sum appropriation. Although the answer is not free from doubt, we believe the courts would most likely hold at least some fee awards to be payable from general funds appropriated to the agencies against whom awards were entered. We reach this conclusion for several reasons. First, a conclusion that all awards may be paid from other than an agency's own funds would undermine Congress' declared purpose to encourage agencies to act more responsibly or suffer the consequences. Second, we are aware of no situations in which agency flexibility to zero-budget authorized activities has been thought to include the power to zero-budget actual obligations of agencies which themselves come into existence through the operation of law. *Cf.* note 5, *supra.*

212

We do not believe that the existence of § 207 in the bill avoids this result. As we have shown, § 207 merely makes access to the so-called judgment fund contingent on a specific appropriation by Congress. Thus, § 207 does no more than shift to Congress consideration of the payment of fee awards which are, in the opinion of the agency involved, a major drain on the resources of the agency.[14]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[14] The General Accounting Office has independently reached the same conclusions as this Office with respect to the availability of agency funds to pay awards under the Act. In a letter of May 15, 1981, to the Chairman of the Administrative Conference of the United States, Acting Comptroller General Socolar opined that payment of awards from agency funds under the Act would require neither a specific appropriation nor even a specific budget request by the agency. In support of this conclusion, he stated that "the purpose of the Act would be frustrated by an interpretation which would permit an agency to avoid payment merely by failing to include an appropriate item in its budget justifications " I have attached a copy of the Acting Comptroller General's letter for your convenience We do not, of course, regard the Comptroller General's views as dispositive, but his views on issues intimately related to the budget/appropriation process are entitled to some respect due to his institutional expertise in this area.

We would add that an agency's determination of what constitutes a reasonable amount of funds to be allocated from lump sum appropriations to pay awards would be less vulnerable to challenge in the courts if a specific figure was presented to Congress in connection with submission of the agency's budget requests

213